# HAM & HAM LEAD & ZINC INVESTMENT COMPANY, Appellant, v. CATHERINE LEAD COMPANY.

### Division Two, June 28, 1913.

1. **SALE: Contract for Stock or Real Estate.** A contract for the sale of "Catherine Lead Company stock to the amount of at least sixty per cent, on a basis of 50,000 shares, par value ten dollars per share. Total number of acres in fee about 1560. Good mill, tram and other improvements valued at about $60,000. The price and terms for the next sixty days will be on a basis of six per share—par value $10 per share," and signed by the president of the company in his individual capacity, is a contract for the sale of stock, and not for the sale of the real estate of the corporation; and if the person to whom the letter was addressed sold the mine, he is not entitled under the contract to commissions.

2. **————: ————: Ratification.** Where the contract was for the sale of sixty per cent of the stock of a corporation at $300,000, and not for the sale of its real estate; a purchaser was to be found in sixty days, and none was found for the stock, but six months later one was found for the real estate, and the whole was sold for $200,000; the said purchaser, when approached by plaintiff, was taken to see other property, and declined to buy, and when his representative reported to a directors' meeting he was informed another proposition was under consideration, and if he intended presenting a proposition it must be accompanied by a cash payment for $1000 offered by the other party, and "this requirement he was unable to meet and was excused;" and some months thereafter the said purchaser, having learned that the other proposition had fallen through, took up the matter of purchasing the entire mine with another, and did purchase it, there was no ratification.

3. **————: ————: Competency of Witness: Interested Party: Other Party Dead.** The secretary of plaintiff company, which sues for commissions on a contract of sale of defendant's real estate made with the deceased president of defendant company, is incompetent to testify on behalf of plaintiff to certain conversations with defendant's said president, tending to show ratification and rehabilitation and extension of the contract. Being a party in interest, the mouth of plaintiff's secretary and stockholder is closed by the death of defendant's president.

251 Mo.—46.

4. ———: ———: ———: ———: ———: **Attorney.** The attorney for plaintiff company, which sues for commissions on a contract of sale of defendant's real estate made with its deceased president, is competent to testify to conversations with said deceased president soon after the property was sold concerning the collection of the commissions sued for. The attorney having no interest in the proceeding or action, and the contract or cause of action in issue and on trial not having been made in whole or in part by him and not being derived through him, he may testify to conversations with defendant's president which grew out of an attempt to collect the commissions sued for, notwithstanding the subsequent death before trial of said president. But, in this case, the refusal of the trial court to permit said attorney to testify was not error, because notwithstanding such refusal the verdict was for plaintiff, and the court did not grant a new trial on that ground.

5. ———: ———: **Theory of Trial: Agency of Contractor: Admission of Objection.** Where plaintiff's theory is that the contract sued on was one of defendant corporation for the sale of its real estate, and defendant's theory is that it was a personal contract of defendant's deceased president for the sale of his individual stock; defendant does not admit that said president was its agent and that what he did was done for it, by objecting to plaintiff's interested witnesses testifying on the ground that said president, who made the contract sued on, is dead. Issues are made by the pleadings, and are not varied by the fact that defendant objects that a witness, in view of plaintiff's theory of his cause of action, is not competent to testify.

Appeal from St. Louis City Circuit Court.—*Hon. William B. Homer,* Judge.

AFFIRMED.

*Joseph Wheless* for appellant.

(1)   It can always be shown, in the case of natural persons, that one who signed a contract, such as this, in his own name, did so as agent for another. Where authority exists the question is one of intention. The same doctrine is applied to corporations. Jones v. Williams, 139 Mo. 37; Lewis v. Pulitzer Pub. Co., 77 Mo. App. 434; Sparks v. Transfer Co., 104 Mo. 531; Bond & Stock Co. v. Houck, 213 Mo. 416;

Kropp v. Brewing Co., 138 Mo. 53. (2) Where the terms of the writing are ambiguous and the intention of the parties cannot be ascertained without resort to extrinsic facts which are controverted or unconceded, the matter of intention is one of fact for the jury, and not of law for the court. Realty Co. v. Clark, 145 Mo. App. 463; Ellis v. Harrison, 104 Mo. 279; Inrow v. Bybee, 122 Mo. App. 475; Counts v. Medley, 163 Mo. App. 555; Nordyke, etc., Co. v. Kehlor, 155 Mo. 656; Hubbard v. Whitehead, 221 Mo. 683. (3) This company had the power to sell real estate; its president was its executive officer; he had authority to employ a real estate agent, and bind the company by it, even by parol. Jones v. Williams, 139 Mo. 27. The knowledge of plaintiff's president is the knowledge of plaintiff itself. This is elemental. It accepted the full fruits of the contract without complaint or murmur. It does not appeal to our better sense of justice and right. Common Sense M. & M. Co. v. Taylor, 247 Mo. 1; Proctor v. Nance, 220 Mo. 114; Bank v. Lyons, 220 Mo. 555; Hughes v. Dodd, 134 Mo. App. 458; Hovey v. Aaron, 133 Mo. App. 528; Childs v. Critchfield, 66 Mo. App. 427. (4) Even if there were any defect in the original contract, it was ratified and adopted by defendant, performed by plaintiff, and is good *ab initio*. "Where an unauthorized act of an agent of a corporation is clearly beneficial to the corporation, a presumption of ratification will arise from slight circumstances." Bank v. Bank, 107 Mo. 153; Hill v. Bank, 87 Mo. App. 605; Publishing Co. v. Warehouse Co., 123 Mo. App. 13; Bank v. Hughes, 84 Mo. App. 273. (5) The evidence, objections and instructions all proceeded on the "theory" of corporate contract —defendant cannot change its theory on appeal. Brick Co. v. Railroad, 213 Mo. 727; Hill v. Drug Co., 140 Mo. 439; Campbell v. Railroad, 175 Mo. 161; Hilz v. Railroad, 101 Mo. 36; Henry County v. Bank, 208 Mo. 226. (6) This court is bound by verdict. "We

wish it to be understood that it is not our province to
determine facts, or review the findings of juries or
courts on them, except in chancery cases." Hamilton
v. Boggess, 63 Mo. 251; Bond & Stock Co. v. Houck,
213 Mo. 426. (7) A witness is competent to testify
to a conversation heard between parties to a contract,
where one party is dead, and the witness is secretary
and treasurer of the other party, a corporation. Shirt
Co. v. Frankenthall, 96 Mo. App. 307; Klopfer v. Levi,
33 Mo. App. 328; Tyler v. Hall, 106 Mo. 320; Deuser
v. Walkup, 43 Mo. App. 628; Mott v. Bernard, 97 Mo.
App. 269. (8) "Before a court is authorized to sus-
tain a demurrer to the evidence because of its insuffi-
ciency, it must appear that, admitting all the evidence
introduced by plaintiff to be absolutely true, and giv-
ing him the benefit of every reasonable inference to be
deduced therefrom, he is not entitled to recover."
Baird v. Railroad, 146 Mo. 265.

*Collins, Barker & Britton* for respondent.

(1) In construing a contract, resort to extrinsic
facts can be had only where the intention of the par-
ties cannot be gathered from the language of the con-
tract; and where such intention can be gathered from
the language of the whole contract it is the province
of the court to determine the meaning. Buxton v.
Kroeger, 219 Mo. 244; Meissner v. Railroad, 211 Mo.
133; Meyer v. Christopher, 176 Mo. 580; County v.
Wood, 84 Mo. 489. There is no ambiguity in the con-
tract in this case; it was a personal contract (not the
contract of respondent corporation) relating to the
sale of certain shares of respondent; any other con-
struction makes meaningless the principal provisions
of the contract, as to subject-matter, price, etc. Sparks
v. Dispatch, 104 Mo. 541. But if the contract were
ambiguous, the contemporaneous construction placed
upon it by the parties themselves will be adopted.

Meyer v. Christopher, 176 Mo. 580; City v. Laclede, 155 Mo. 1; Williams v. Railroad, 153 Mo. 487; Craig v. Seybt, 91 Mo. App. 242. (2) Proof of ratification by a corporation, or adoption by acquiescence, of a contract not made in its name, or by its authority, must be clear and convincing; and, for either ratification (an affirmative act), or adoption by acquiescence (a negative act), full knowledge is essential, and, after knowledge, some act or acts indicating clearly an intention to adopt. Jones v. Williams, 139 Mo. 24; Hill v. Mining Co., 119 Mo. 9; Bank v. Gay, 63 Mo. 33; Besch v. Carriage Co., 36 Mo. App. 333; Pfeiffer v. Landsberg, 44 Mo. App. 59; Steunkle v. Railway, 42 Mo. App. 73; Story on Agency, sec. 239; Morawetz on Corporations, sec. 232. The subject-matter of the contract made the contract *ultra vires* as a corporate contract; but, aside from that, there was no proof of ratification or adoption by the corporation. (3) Respondent's president and its attorney were not competent witnesses; their testimony was offered to show some alleged admission by the deceased, Brickley, on the theory that the same would bind the corporation through adoption or acquiescence of the Brickley contract; and the court properly excluded them as witnesses. R. S. 1909, sec. 6354; Bank v. Rood, 132 Mo. 256; Green v. Ditsch, 143 Mo. 8; Hollman v. Lange, 143 Mo. 106; Bank v. Slattery, 166 Mo. 633; Kirton v. Bull, 168 Mo. 631; Ashbury v. Hicklin, 181 Mo. 671; McKee v. Downing, 224 Mo. 137. And notwithstanding the exclusion of these witnesses, there was a verdict for plaintiff on its first count. (4) This respondent was forced into the position of trying the case on the theory adopted by appellant and by the court, and there can be no constructive admissions laid against respondent by reason of objections based upon such theory, nor by reason of instructions made necessary thereby. Taylor v. Railroad, 213 Mo. 727.

FARIS, J.—Plaintiff sued defendant in the St. Louis Circuit Court for certain commissions alleged to be due it, as the assignee of a consummated contract for the sale of the mining properties of defendant. The jury returned a verdict in favor of plaintiff for $16,433.30, which verdict was set aside by the trial judge upon motion for a new trial filed by defendant. From the action of the court in granting a new trial, plaintiff, after the usual procedure, has appealed.

The plaintiff went to trial on a petition having originally three counts: the first was bottomed upon the below contract; and the third upon a *quantum meruit*. (The second count was dismissed and its contents are not shown, nor are they pertinent.) The jury found for plaintiff on the first count, as stated, but on the third count, which was upon *quantum meruit,* the finding was for defendant. The answer of defendant to the first count was a general denial; to the third count a general denial, plus a plea of the Statute of Limitations. Reply, conventional and not here pertinent.

The reasons which moved the learned trial judge in sustaining the motion for a new trial are thus succinctly stated by him in the memoranda by him filed, to-wit:

"I have gone over again and again the contract of January 21, 1904, and I cannot make out of it an authorization or direction of the defendant to the plaintiff to sell the real estate in question. I cannot give it the meaning necessary for the plaintiff to recover in this case without wholly disregarding a large portion of that part of it which is in writing.

"As to the point that the defendant offered instructions along similar lines to those offered by the plaintiff, it is sufficient to say that the defendant was forced into that position by the refusal of the court to give a peremptory instruction at the end of the plaintiff's case.

"I feel, therefore, obliged to grant the defendant a new trial in this case for failure to give such instruction."

The facts necessary to an understanding of the legal questions involved are that at and before December 9, 1903, the defendant, a corporation, at the time owning certain extensive mining properties in Madison county, Missouri, had become financially involved to a pressing and acute degree and was desirous of selling its holdings. S. H. Brickey, who died before this suit was tried below, was the president of defendant. At a special meeting of defendant's board of directors, held on December 9, 1903, the below order was made:

### SPECIAL MEETING.

The president was authorized to offer Mr. Beers a commission of ten per cent should he effect a sale of the property within thirty days at a price of $300,000, it being understood that the commission would be paid only as cash payments on the property were made.

Defendant company was capitalized at the sum of $500,000, divided into shares of ten dollars each par value.

Something *over a month after* the making of the order above quoted, S. H. Brickey executed with plaintiffs' assignors (who were then co-partners only, doing business as Ham & Ham, but who have since incorporated under the name and style here shown in the caption), the following agreement:

### WE DO NOT SELL STOCK.

Ham & Ham,
   Zinc and Lead Investments,
      10 Wall Street, New York.
         Frisco Bldg., St. Louis, Mo.
We do the advertising.
We send purchasers direct to owners.

Dated at ————, Jan. 21, 1904.

Ham & Ham,

    St. Louis, Mo.

Gentlemen:

    We have for sale the following described mining property (prospectus, etc., attached to this letter), situated in:

    *Catherine Lead company stock to the amount of at least (60%) sixty per cent, on a basis of* 50,000 *shares, par value* ($10) *ten dollars per share.*

    Total number of acres in fee about 1,560.

    Total number of acres under lease ———————— on which we pay ———————— per cent royalty.

    Machinery and improvements consist of:

    *Good mill, tram and other improvements valued at about* $60,000 *or more; also several tenant houses,* 30 *or more, and several hundred acres of fine farm land (see last report).*

    If you send us a customer, with or through whom we make a deal on the above described property, we agree to pay you 10% on the first $50,000, or any part thereof, and 5% on all over $50,000, when property is conveyed.

    We agree to telegraph you a price on the above property at any time you desire to introduce customers. The price and terms for the next 60 days will be as follows:

    *On a basis of six per share—par value* $10 *per share.*

    We agree that the price made to you will be as low as price made to anyone else. We sign the above contract with the understanding that the prospective purchaser will be introduced to us, and that we are to deal with him direct.

                                 S. H. BRICKEY.

    (This contract was on a printed form. We show in italics the words written thereon in pen and ink.)

    On May 12, 1904, the minutes of the directors' meeting show the following, among other things, to-wit:

    Mr. Brickey also reported that the parties who had spoken to him about the property had sent an engineer down to examine it and would report May 13th. In order to give the first parties a chance for a hearing, and inasmuch as their letter was on the way and Mr. Carter's proposition could, in all probability, be held over for a day, it was resolved to adjourn the meeting until Friday, May 13th, at twelve noon, and postpone any action until then.

    May 13, 1904. *Adjourned meeting.* Mr. Carter renewed his offer made May 12th, and tendered deposit of $1000 to secure option. Mr. Brickey stated that Hamm & Hamm, who

sent an engineer down to examine the property, telephoned him that their Mr. Ross would report at this meeting as to what the report was and what they proposed doing. Mr. Ross was therefore invited by phone to come to the meeting and report. Mr. Ross arrived and stated that the engineer, Mr. Hall, above referred to, had made report on the property, but he, Mr. Ross, did not show any written statement other than his own relative to the result of the examination. He was informed that the Carter proposition was under consideration, and if he intended presenting a proposition it would have to be accompanied by a cash payment greater than $1000 offered by Mr. Carter. This requirement he was unable to meet and was excused from the meeting.

Prior to the transactions had at the directors' meeting, the minutes of which we quote above, plaintiff wrote to Brickey the following letter:

· St. Louis, Mo., May 5, 1904.

Mr. Brickey,
        Catherine Lead Co., City.
Dear Sir:
        A gentleman from· Cleveland, accompanied by a mining engineer from the west, is here, and in the market for a good lead property. I have spoken with him regarding the Catherine. Could you make it convenient to step over to our office for a few moments?                    Yours truly,
                              HAM & HAM,
                    Zinc and Lead Investment Co.,
                              A. Ross, Secretary.

Thereupon Brickey came to the office of plaintiff company and after a conversation had with August · Ross, the secretary of plaintiff, wrote this letter:

St. Louis, Mo., May 5, 1904.

Mr. L. J. Cox, Supt.,
        Catherine Lead Co.,
                Fredericktown, Mo.
Dear Sir:
        You will please show these gentlemen through our mines and mining property and give them any information that they may wish in regard to mine and plant. They are looking at the property with a view of probably purchasing.
                    Yours truly,   ·
                              S. H. BRICKEY, Pres.

Between May 5, 1904, when the letter from Brickey to the superintendent of defendant at Fredericktown was written and the date of holding the directors' meeting, the minutes of which are last above set out, the defendant's properties, about the sale of which this controversy wages, were partially examined by one S. W. Hall, a mining engineer, in the employ at the time and acting for one George B. McManamon, who subsequently, on September 9, 1904, bought the entire property of defendant. McManamon is the "gentleman from Cleveland," who is mentioned in the letter of plaintiff to Brickey of date May 5, 1904, supra. The subsequent transactions between plaintiff, whose dealings in the matter were handled by Ross, its secretary, and defendant, represented (as plaintiff contends, but defendant vehemently denies) by Brickey, and said McManamon, which at last culminated in the purchase of defendant's properties by and their conveyance to McManamon, may be told in the latter's own language:

"I am George B. McManamon to whom the property of the Catherine Lead Company was sold in September, 1904. I am acquainted with Mr. Ross, and with the property of the Catherine Lead Company.. In the spring of 1904 I received a circular issued by Mr. Ross describing some properties in Missouri, and I corresponded with Mr. Ross about that, and finally got Mr. Hall to come east and we met Mr. Ross here and went over to see the 'Virginia Mine," located, I think, near the Frisco Road. That was prior to May 5, 1904. I first heard of the Catherine Lead Company while we were on the trip to see the Virginia and another mine. After turning down the _properties which we went to see, Mr. Ross had spoken several times about a Catherine mine, and stating that he had some stock of that mine for sale—in the Catherine Lead Company. On the trip back from looking at those properties, we arranged to go to Mr. Ross's

office the next morning about the Catherine. That was about the 5th of May. That was the occasion upon which I met Mr. Brickey. Upon the arrival of myself and Mr. Hall in Mr. Ross's office, he communicated with Mr. Brickey and Mr. Brickey came over for the purpose of taking up the matter of a possible purchase of the mining property there in Madison county; and after some discussion of the property Mr. Brickey dictated a letter to Mr. Cox, superintendent of the mine, at Fredericktown, to give us access to the property, and it was upon that authority that I proceeded with Mr. Hall and Mr. Ross the next day to the property. On the following day Mr. Ross, Mr. Hall and myself went to Fredericktown to look at the Catherine. Mr. Hall, my engineer, made an examination of the Catherine mine at that time for me. The price made to me for the Catherine mine was $300,000, I think. I did not purchase the mine at that time. We didn't have time to examine it in the first place, and, of course, would not have purchased until we had made a satisfactory examination of it. I think within two weeks I learned that they were figuring with other parties on it. I, then, for the time, dropped that property from any further consideration. I afterwards had further negotiations with Mr. Ross relative to other properties. When I was advised that the Catherine property had been sold to other parties I had no further negotiations with Mr. Ross relative to the Catherine property. I received the telegram dated May 12, 1904, sent to me at Cleveland, Ohio, by the Ham & Ham Zinc and Lead Investment Company, which Mr. Carter testified was dictated by Ross in his presence, and which was read to Mr. Brickey. That is the proposition coming from other parties which caused me to suspend negotiations at that time. I next took up the matter of purchasing the Catherine property about August 1, having received a letter from Mr. Hall stating that some one had come to him with refer-

ence· to purchasing the Catherine property, and thought I had better come to St. Louis and go into the matter with him, which I did, and thereafter made an offer direct to the company for the property. I first offered $185,000, and finally bought the property for $200,000, $60,000 cash and assuming $140,000 of bonds as part of that price. This offer was accepted after a meeting of the stockholders of the company. I would not have considered the purchase of this mine at the price of $300,000.''

From this excerpt it is seen that plaintiff was instrumental in bringing McManamon and defendant together, and in conveying to McManamon the fact that defendant's properties were on the market. Further light is thrown upon the details of this phase of the case by the testimony of Hall, the mining engineer. He was called as a witness for plaintiff, and, among other things, said:

''I first had the fact that the Catherine property was for sale brought to my attention by Mr. Ross, through an inquiry of mine made to him, outside of St. Louis. I came down here to look at an entirely different property altogether. I didn't know anything about any Catherine property. That property was a failure, wasn't what I wanted or expected to find it at all. I then asked Mr. Ross if he knew of a lead mine in the State of Missouri that was for sale. He then mentioned that sometime previous to that he had an option, or his company had an option on the Catherine, but that it was his remembrances that that option had expired on the property; that when he came back to St. Louis he would see the parties owning the property and if·he could renew that option, that if the price was right, possibly he might interest us in that property and thereby make a sale. Mr. Ross was to look up this particular property he had mentioned and find out something about whether he could renew an option or something that he had that

had run out and let us know. He told Mr. McManamon and me what time to come up and we went to his office and he had Mr. Brickey come over there from somewhere, I don't know where.''

As shown by the testimony of McManamon, conveyance of the property to him was had on September 9, 1904. This suit was filed September 8, 1909. In the meantime Brickey had died.

The theory of the defendant was that the contract shown in evidence was the personal contract of Brickey to sell for him shares of stock held by Brickey in defendant corporation, and not a contract *by* Brickey *as the president and agent of defendant to sell the properties of defendant.*

As bearing out this theory of defense, the testimony of W. F. Carter, who was of counsel for defendant and its vice-president, but who was called as a witness by plaintiff, showed that Brickey had counselled and advised with the witness as to whether he (Brickey) was safe in agreeing to sell sixty per cent of the stock of defendant company and had been told by Carter that he was; that he (Carter) ''would sell the whole capital stock short on these terms.'' The amount of Brickey's holdings of stock appears but vaguely. Beyond the fact that the witnesses ''do not think'' he owned sixty per cent, but ''do not know'' how much he owned except that he was ''rather a large stockholder,'' the record upon this point is satisfactorily indefinite.

Shortly after the directors' meeting of May 13, 1904, plaintiff rendered a statement to ''S. H. Brickey and Catherine Lead Company'' for time and expenses in showing the mine to McManamon, amounting to the sum of $90.75. No attention being given to this statement by either Brickey or Catherine Lead Company, the matter languished till September 22, 1904, after the sale to McManamon, when a statement and claim on defendant for commissions was sent to it by

mail. No attention seems to have been paid to this statement, except that the fact of receiving it was mentioned by Brickey to Carter. After Brickey's death, and almost five years later to a day, this suit was filed.

On the trial, Judge George H. Williams, then a circuit judge, but formerly of counsel in this matter for plaintiff, was called as a witness, and the following occurred:

"Q. Did you have any conversation with Mr. Brickey in the presence of Mr. Ross, Mr. McManamon, and possibly others, about September, 1904, in regard to the matter of the sale of the property of the Catherine Lead Co?

"Mr. Carter, of counsel for defendant, interposed and asked leave to examine the witness on *voir dire,* upon which it appeared that Judge Williams had been attorney for Mr. Ross and for the Ham & Ham Co. at the time, and that Brickey was since dead.

"Mr. Carter: The contract sought to be established was originally made with Mr. Brickey, who was president of the Catherine Lead Co. The purpose of Judge Williams's visit was as the attorney for Ross, representing him in this particular matter. Now, our contention is that Mr. Brickey, being the agent of the corporation, and being dead, Judge Wililams is not competent to testify to any conversation had with Mr. Brickey. . . .

"The witness replied that he had a conversation with Mr. Brickey. . . .

"The Court: I will have to sustain the objection as to what that conversation was.

"To which ruling of the court plaintiff then and there excepted."

At the close of the testimony for the plaintiff the defendant demurred to the evidence, and again at the close of all of the evidence in the case defendant requested instructions for a peremptory verdict, which

the court refused to give, and defendant saved its
exceptions. For this error in so refusing peremp-
torily to instruct the jury to find for defendant, the
court below granted a new trial to defendant. From
this order granting a new trial on the grounds noted,
plaintiff appeals. The question and its corollaries as
to whether there was sufficient evidence to take the
case to the jury, are the only points here involved,
or necessary to be discussed with any seriousness in
the subjoined opinion, which circumstance has made
necessary a statement of facts inexcusably long.

I.   The only contention of appellant with which
we need concern ourselves, is as to whether there was
sufficient testimony on the first count to
go to the jury. The respondent, who was
the defendant below, contends that there
is not. The court *nisi* took this view, and
so holding granted defendant a new trial,
on the ground as bluntly stated by the
learned trial judge, that having gone again and again
over the contract of January 21, 1904, he could not
*"make out of it an authorization or direction of the
defendant to the plaintiff to sell the real estate in
question."* In passing, it may be said that the prop-
erty and all of the property held by defendant con-
sisted of 1560 acres of land, having thereon a "mill,
tram and other improvements valued at about $60,-
000 or more," including on said land, tenant houses
and farm lands.

Before the learned trial judge may be convicted
of error, two points must be held in favor of appel-
lant's contentions. The contract quoted must first be
held to be the contract of the defendant and not the
personal contract of Brickey; and second, it must be
held to be an agreement to sell real estate and not
one to sell stock in a corporation. Clearly, should
we be able to hold that it is an agreement for the sale

of real estate, then by inference too clear for argument, the other proposition falls out of the case; because while Brickey held stock in the defendant company, he had, so far as the record discloses, no real estate even measurably within the description set out in the contract.

Keeping in mind that the contract under review was on a printed form, and that the words of description of the property to be sold and offered for sale, were written therein in ink, as follows: *"Catherine Lead Company stock to the amount of at least (60%) sixty per cent, on a basis of 50,000 shares, par value ($10) ten dollars per share,"* it is a little difficult to see why Brickey and plaintiff's assignor should have gone to the trouble of making such a recital as this, when a mere description of the lands owned and their location, would have covered the contentions of plaintiff. Taking the view of plaintiff, it is also difficult to see why, if the real estate of defendant was the property to be sold, that terms mentioned should have been set out as *"on a basis of six per share—par value $10 per share."*

The other written parts of the contract are consistent both with the view that either stock or real estate was to be sold. For if corporate stock was offered, clearly the purchaser would be desirous of knowing what property, and how much property the company issuing such stock held, so that some sort of estimate of value could be put on the stock.

Nor was this contract signed by defendants, or by S. H. Brickey as the president of defendant; it was simply signed by Brickey, in his individual name, without aught appearing to show, or even to create a suspicion that Brickey was acting otherwise than as an individual holder of stock, who desired to sell the same for sixty cents on the dollar. Extrinsic evidence adduced on the trial lends color to the latter view, for the testimony of the witness Carter shows

that Brickey had Carter go to the office of plaintiff and look over the contract, and there inquired of Carter if he (Brickey) was safe in executing the contract. He was told by Carter that the latter considered him safe, for he (Carter) would sell all of the stock short at the same price.

A casual reading of the contract would seem to settle this case. It seems too plain for argument that the contract sued on is not the contract of defendant for the sale of its real properties, but is merely the contract of Brickey for the sale of stock thereof, held or controlled by him *to the amount at least* mentioned therein. The contract was good for more than 30,-000 shares; the purchaser consenting, it was good for less than 30,000 shares, at six dollars per share. Citation of authorities and argument can add not one whit to the view inevitably forced upon us by our inspection of the contract, and a bare statement of the facts settles the question. The view of the trial court that the contract was not upon its face that of defendant for the sale of its mining properties, was correct.

II. It is urged, however, that there was a ratification of this agreement by defendant corporation, that something was done by defendant making the contract that of defendant. If this is so, we must perforce find it from the record, as the sole source of information available to us.

**Ratification.**

Turning to the record we find that the only bit of evidence lending any color to this contention is contained in the excerpt from the minutes of the directors' meeting, set out in the statement, to-wit: "Mr. Brickey stated that Ham & Ham, who sent an engineer down to examine the property, telephoned him that their Mr. Ross would report at this meeting as to what the report was and what they proposed

251 Mo.—47.

doing. Mr. Ross arrived and stated that the engineer, Mr. Hall, above referred to, had made report on the property, but he, Ross, did not show any written statement other than his own relative to the result of the examination. He was informed that the Carter proposition was under consideration, and if he intended presenting a proposition it would have to be accompanied by a cash payment greater than $1000, offered by Mr. Carter. *This requirement he was unable to meet and was excused from the meeting.*"

This is all that appears from the minutes of the defendant corporation even squinting at ratification. So far from ratifying anything that Brickey did, or ratifying and making its own the written agreement or any agreement which Brickey had with plaintiff's assignors, this entry closes by saying: "This requirement he was unable to meet and was excused from the meeting." It is true that "when an authorized act of an agent of a corporation is clearly beneficial to the corporation, a presumption of ratification will arise from slight circumstances." [Bank v. Bank, 107 Mo. l. c. 145; 2 Morawetz on Private Corp. (2 Ed.), sec. 629.] But this is beside the question here. For confessedly, Brickey is not shown to have made any agreement with plaintiff's assignors, except the one in writing, which we set out. We have seen that no sort of logic or reasoning can contort this written agreement into a contract for the sale of the real property of defendant. So, if there was a ratification by defendant corporation what was ratified? If we concede *arguendo* the application of the contract to the property of defendant, and the ratification thereof by defendant, then we come to the serious question of fulfillment by plaintiff. If it applied and if it was ratified, how was it carried out? The contract fixed the sale price on a basis of $300,000; the property was sold for $200,000. The contract by large inference, expired March 21, 1904; the sale was not consummated

till September 9, 1904. By the same inference a purchaser was to be found in sixty days; none was found till more than 100 days. When found this purchaser "dropped the property from further consideration. . . . and had negotiations with Mr. Ross relative to other properties;" and, though later he returned to the lure, did not buy till more than six months had elapsed, coming again to a consideration of purchasing the property at the behest of one Wagner.

Besides, the entry from the minutes of the directors' meeting, which we quote herein, and the bare fact of a sale upon different terms and at a different price, of—we may be warranted in saying—wholly different property to a purchaser found by plaintiff's assignor, there is utterly nothing in the record to indicate ratification. The state of the facts answers the contention, it seems to us. For it ought to be reasonably apparent that, unless upon the facts we can hold that the contract up for judgment was a contract for the sale of real estate, it would be well-nigh an impossibility to carve out of any state of facts subsequently arising anything approaching a ratification. As logically contend that a contract for the sale of a ship could be ratified into a contract for the sale of a camel, because forsooth poets sometimes floridly speak of the camel as a "ship of the desert."

A mere statement of the conditions, facts and acts, requisite to create the implication of ratification (which is after all a branch of the doctrine of estoppel) will make apparent how far short of these requisites the facts here fall. In the case of Common Sense Mining Co. v. Taylor, 247 Mo. l. c. 26, GRAVES, J., quoting 2 Thompson on Corporations, p. 1048, says:

" 'In the law of agency there is a rule that if one accepts the benefits of an unauthorized contract made in his behalf by another, he is bound by its terms the same as if he had entered into the contract in person or had expressly ratified it; provided of course that

he had full knowledge of all the facts, and he is thereby estopped from repudiating the contract without restoring the benefits and putting the other party *in statu quo*. This principle is applicable, in its fullest sense, to corporations, which, from their nature, can act only through the instrumentality of agents. If, therefore, an officer of a corporation, or other person, assuming to have power to bind the corporation by a given contract, enters into the contract for the corporation, and the corporation receives the fruits of the contract, and retains them after acquiring knowledge of the circumstances attending the making of the contract, it will thereby become estopped from afterwards rescinding or undoing the contract. In other words, by retaining the fruits of the unauthorized contract with knowledge of the circumstances which entitle it to its election either to affirm or disaffirm it, the corporation ratifies the contract and makes it good by adoption.' "

Applying what is said in the above excerpt, which though apropos, states the rule negatively as to the facts before us, we are constrained to disallow relief to appellant upon any reason growing out of ratification.

III.   Appellant contends that the court erred in excluding the testimony of August Ross, who was the secretary of plaintiff company, and one of its stockholders, and who was offered to prove certain conversations with S. H. Brickey, tending to show ratification and rehabilitation and extension of the contract sued on. Appellant also contends that the court *nisi* erred in refusing to admit the testimony of Judge George H. Williams who was offered to show certain conversations with S. H. Brickey, deceased, on September 23, 1904, some two weeks after the property was sold and conveyed to McManamon. Judge Williams, when he had the

*Ratification: Evidence.*

alleged conversation with Brickey, was acting as attorney for plaintiff, presumably trying to collect the commission here sued for. When he was offered as a witness he was one of the judges of the circuit court of the city of St. Louis.

We think the court *nisi* was right in its ruling as to Ross and wrong as to its ruling as to Judge Williams; that Ross's testimony as offered and for the purpose offered, was incompetent, but that of Judge Williams, upon the objection urged at least, was competent. This is so for these reasons: At common law all persons interested in the result of a lawsuit were incompetent to testify. Our statute (section 6354) removes this incompetency as to parties in interest, except "that in actions where one of the original parties to the contract or cause of action in issue and on trial is dead . . . , the other party to such contract or cause of action shall not be admitted to testify either in his own favor or in favor of any party to the action claiming under him." The section further provides that in a derived action where he from whom the action is derived is, or would be incompetent, the deriver is also incompetent. This has been said to be "an enabling and not a disabling statute." [Bates v. Forcht, 89 Mo. l. c. 128.] Whether this is always true we need not stop to consider. This much is clear, that the object and intent of the statute and its proviso under consideration was to make incompetent or leave incompetent, as at common law, a witness having by reason of his interest in the result of an action both the incentive to perjury and the opportunity, by perjury to obtain an unfair or unconscionable advantage over the estate, or representatives of one, who being dead, can protect neither his property nor his word. But in order to be rendered incompetent the witness must be both interested and be a party to the contract or cause of action, which was made with a deceased person. (We are not here

discussing the phase of a derived contract; this would of course require an additional exception.) If the witness has no interest in the proceeding or action, and if the contract or cause of action in issue and on trial was not made in whole or in part by him, or is not derived through the witness, he may testify, the death of the other party notwithstanding. The negative or non-disqualifying phase of the rule is pretty clearly stated in the case of Savings Bank v. Slattery, 166 Mo. 1. c. 633, as follows:

"But counsel for defendants urge that Street, being also a stockholder, was an interested party and so incompetent to testify. It is sufficient answer to this to say that under our statute the interest of a witness alone does not exclude him, where the other party is dead. That happens only because he and the deceased are both parties to the contract, or cause of action. In other words, the body of the statute removes the common-law disability arising out of interest, while the proviso confines the exclusion in case of the death of one party to a party to the contract or cause of action, so that a 'party to the contract,' as the term is used in the statute, is considered to mean the person who negotiated the contract, rather than the one in whose name and interest it was made. [Banking House v. Rood, 132 Mo. 256.]"

Applying these views to the condition at bar and keeping in mind that under the facts the recovery here cannot be based directly on the contract set out, but must be bottomed, if upon any consideration it will lie, upon something done, or said, or omitted to be done or said, by Brickey, as president of defendant *in his dealings with Ross after the written contract was made,* it will be reasonably clear that Ross was not a competent witness, whatever might have been the condition, if a recovery could be predicated directly on the written contract. [Banking House v. Rood, 132 Mo. 1. c. 263.]

Conceding then that Judge Williams was compe-
tent as a witness, since he had no interest in the action
contingent, derived or direct, and that his rejection as
a witness was error, was it such error as to hurt
plaintiff upon the facts here. We think not, for the
reason that the rejection of Judge Williams notwith-
standing, plaintiff got a verdict from the jury. Nor
was this verdict set aside by the court for any reason
even remotely growing out of the rejection of Judge
Williams's testimony. We cannot allow this point
to appellant.

IV. During the trial many objections to the of-
fering of testimony were made by defend-
**Agency:** ant's counsel, couched in language of which
**Admission.** the below excerpt is a fair sample:

"Mr. Carter: We object to this witness testify-
ing further, because it appears already that he is the
representative of plaintiff in this case, and that Mr.
Brickey, the president of the defendant company, who
made this contract, is dead. This witness is not qual-
ified to testify in this case upon the showing already
made."

Plaintiff contends that these objections (of which,
having counted them, plaintiff's learned counsel says
nine were made) are admissions of the agency of
Brickey and of the fact that what Brickey did was
done for the defendant company, and not as defendant
contends, by Brickey for himself as an individual.

It is but a begging of the question to thus insist
upon the facts here. Defendant surely had the right
to try the case upon the theory of plaintiff itself.
Upon the theory of defendant that the contract was
the personal contract of Brickey, had the suit been
against Brickey's representatives, the same objection
could have been urged without doubt or question. It
is not the privilege of either party in an action either
at law or in equity, to assume that the position of such

party is so far right as that the other party may not question it (compare Patton v. Fox, 169 Mo. 97); nor may one party object because the other party gives battle upon the identical field which the opposing side has chosen. Issues are issues till they are proven, and it would be in a way a serious reflection upon the intelligence both of courts and of juries, if with a clean-cut defense before them, they were swayed by the mere form of an objection, which but followed the plaintiff's theory of the case. Did defendant contemplate that either of the nine objections made by it should be a solemn admission which would overturn its defense as set up in its answer? The question needs no answer.

In our view of the case the learned judge, *nisi*, was right in granting a new trial, and the case should be affirmed, and remanded. It is so ordered. *Brown, P. J.*, and *Walker, J.*, concur.