BURNELL B. DUTTON, BY JULIA T. DUTTON, NEXT FRIEND, APPELLANT,
v. PRUDENTIAL INSURANCE COMPANY OF AMERICA, A CORPORATION,
RESPONDENT.—193 S. W. (2d) 938.

St. Louis Court of Appeals. Opinion filed April 16, 1946.

*John P. McCammon, David L. Millar* and *Neuhoff & Millar* for appellant.

1060

*Fordyce, White, Mayne, Williams & Hartman, Walter R. Mayne* and *F. W. Schwartz* for respondent.

McCULLEN, J.—This is an appeal from a judgment of the Circuit Court of the City of St. Louis dismissing a suit in equity which was filed by appellant through his mother as guardian. Appellant will be referred to herein as plaintiff.

Plaintiff's brief contains a statement of the case which, according to the adverse party's brief, is "a true reflection of the record." Therefore, in stating the case, we shall utilize plaintiff's statement without quotation marks, but make such minor changes as we deem necessary for our purpose.

Plaintiff's petition is in two counts. The first count is for reformation of a contract of insurance written in 1934 by Prudential Insurance Company, hereinafter referred to as defendant, upon the life of Burnell B. Dutton, plaintiff's father, who died January 27, 1936, so as to reflect what plaintiff contends was the true meeting of the minds of the parties as to the manner and time of payments to him as a beneficiary.

The policy as written provides for retention by defendant of 4/5th of the proceeds thereof at interest of three and one-half per cent until plaintiff attains the age of twenty-one years (which will occur in 1954), at which time he will receive $1,000 in one sum and monthly installments thereafter of $50 per month (or $5 per month per $1,000 payable, if greater) until he attains the age of twenty-six years, and then $100 per month thereafter until the fund is exhausted. Plaintiff alleges that deferment of the commencement of payments until plaintiff is twenty-one years old is due to mutual mistake in writing up the policy and that it was intended by the parties to the contract, the insured and defendant, that the payments should begin at the death of the insured.

The second count of the petition seeks to impress the insurance proceeds held by defendant for plaintiff's benefit with a trust, and prays that defendant be ordered to make such disbursements there-

from as the court may find necessary for the support, maintenance and education of plaintiff infant, who is in need thereof.

Defendant's motion to dismiss County II of the petition, on the ground that it failed to state a cause of action, was sustained and exceptions thereto duly saved. The cause was tried on the first count only of plaintiff's petition.

The answer of defendant admitted the issuance of the policy in question, denied that there was any mutual mistake, averred that the insured by his conduct ratified and confirmed the policy and waived any claim that the policy did not truly reflect the contract agreed upon, and that as a consequence plaintiff is estopped from asking for reformation of the contract. The answer of defendant further pleaded that defendant has fully performed the contract entered into with the insured.

It was stipulated by the parties that Julia T. Dutton is the duly appointed and acting guardian of plaintiff, an infant born February 22, 1933; that defendant is a New Jersey corporation authorized to issue life insurance policies in Missouri; that it issued the policy herein (which, with the application attached, is referred to as plaintiff's Exhibit 1) on the life of Burnell B. Dutton, payable one-fifth (1/5) to Julia T. Dutton, wife, and four-fifths (4/5) to Burnell B. Dutton, Jr., son; that on the death by accident of Burnell B. Dutton on January 27, 1936, the sum of $20,000 became payable thereunder, $4,000 of which was paid to Julia T. Dutton, and a claim settlement certificate (Plaintiff's Exhibit 4) in the sum of $16,006.38 was issued by defendant. The stipulation offered in evidence the policy and the claim settlement certificate.

Plaintiff is the only child of the deceased insured, Burnell B. Dutton, and his wife, Julia T. Dutton. In November, 1934, when plaintiff was an infant approximately twenty months old, his father, Burnell B. Dutton, who was then thirty-nine years of age and employed as a test man of the Beaumont Exchange of the American Telephone and Telegraph Company, at the solicitation of Eldon Haley, a special agent and assistant manager of the defendant's St. Louis, Missouri, agency, applied for a $10,000 face value policy of life insurance in the defendant company. The application signed by Mr. Haley and Dr. Dutton, dated November 3, 1934, stated that the applicant lived at 5160 Goethe Avenue, St. Louis, Missouri; that he had no other life insurance; that the insurance applied for was to be payable to Julia T. Dutton, his wife, age twenty-one, and Burnell B. Dutton, Jr., son, age fourteen months. It is not disputed that the son was in fact aged twenty months at that time. The application is filled in in the handwriting of Mr. Haley. The mode of payment is not stated in the application—the application only specifying who were to be the beneficiaries, the insured's wife and son. Question 15 of the application and the answer thereto are as follows:

"15. To whom is this insurance to be payable at your death:
"Julia T. Dutton                                    wife
"Burnell B. Dutton, Jr.                          son"

After the preparation and making of the application, one of the cashiers at the St. Louis office of defendant company wrote into said questionnaire space of question 15, the following: "(See 9175 attached)." In response to question 14 of said application, to wit: "State any special request. If Installment Option 1 or 2, or Amount Left with Company, Option 3, is desired, give particulars," there was written, "Letter attached. Dividends to accumulate." No letter was attached to the policy, but Mr. Haley testified that the reference "Letter attached" in the application referred to the defendant company's questionnaire Form 9175. Form 9175, Plaintiff's Exhibit 2, was not attached to the policy either, but was in defendant's files and was produced at the trial. It is a form questionnaire of the defendant company which was prepared by a cashier in its St. Louis office, dated three days after the application for the insurance, from information given to said cashier by Mr. Haley at a time when Mr. Dutton, the insured, was not present, and Mr. Dutton never examined this form. From the data on the questionnaire, Form 9175, prepared by defendant, the rider to the policy, known as Form 10777, specifying the manner of payment, was prepared by the home office of defendant company at the time the policy was prepared by it. Questionnaire Form 9175 states, in response to question 8, "Under Option No. 3 indicate period to be held:", the following: "(b) Until age 21," and in response to question 10, "Under Option No. 3, shall beneficiary or beneficiaries have right to withdraw?" (A space is left for checking "yes" or "no" but neither is checked.) "If yes, state amount that may be withdrawn and time of withdrawal," shows the following: "$1000 in cash at age 21 and balance $50.00 per month under Opt. #4 for 5 years, then $100.00 per month under Opt. #4 as long as proceeds last."

The rider, Form 10777, although dated November 1, 1934, was in fact prepared at defendant's home office subsequent to the receipt of the application and questionnaire, Form 9175, from defendant's St. Louis office, and prepared from the data on them.

With respect to the purpose of the insurance, Mr. Haley, who was called as a witness for plaintiff, testified:

"Q. You knew he had a wife and one son? A. I knew that.

"Q. And it was largely for the protection of the son that he wanted this policy, wasn't it, Mr. Haley? A. Yes, sir.

"Q. How old was the son at the time you wrote the policy, do you recall? A. I would think, I am not sure, it was a year.

"Q. But he did tell you that he wanted this policy largely for the boy's protection? A. That is right."

The policy, dated as of November 1, 1934, was received in St. Louis about December 1, 1934, and thereafter delivered by Mr. Haley in person to the insured. A short time thereafter, it may have been as little as a day or it may have been as much as two weeks, Mr. Haley wrote a letter to Mr. Dutton (Plaintiff's Exhibit No. 3) summarizing the policy provisions, as was Mr. Haley's practice in some cases, setting out briefly the nature of the protection which the policy provided. Mr. Haley testified that he didn't have the policy before him when he wrote said letter, but wrote it from memory. The pertinent parts of said letter are as follows:

"Dear Dutt:—

"I will attempt to set forth some of the features and benefits of your recent policy which you may refer to as the years go by.

| "Death Benefits | Natural Death | $10,000 |
| | Death by Accident | 20,000 |

"In case of death the insurance is payable—

To Mrs. Dutton ....... 1,000
To Burnell, Jr., $50.00 per month until he reaches age 26 at which time he receives $100 per month until the face amount of the insurance is used up.
Interest at 4% present rate.

". . . This contract will give you the peace of mind that Burnell Jr. will be protected until he can earn money for himself. . . .

"I hope this policy will be a constant joy to own, and if you live you will never regret the step you took to own it."

As written, the policy provides a "face amount of insurance" of $10,000 payable to the "beneficiary or beneficiaries designated on rider Form 10777, attached to this policy, and in the manner provided." The policy also provides for an accidental death benefit of $10,000 "payable to the Beneficiary in addition to the Face Amount of Insurance . . . in event of death by accidental means . . ."

". . . upon receipt of the proof of death . . .," with no reference to the rider Form 10777.

The insured met death by accident about fifteen months after the policy was written, at which time plaintiff was a little less than three years old, so that the total sum of $20,000 was payable under the policy—one-fifth or $4,000 to the wife, and four-fifths or $16,000 to the son, plaintiff herein.

Payment to the wife of the insured, Mrs. Julia Dutton, of her share of the policy was promptly made by defendant. The check therefor was delivered by Mr. Haley, at which time, according to Mrs. Dutton's testimony, he made the remark to her that there had

been "some mix-up on the 'kid's' part," but said that he would have it changed and get in touch with her.

Mrs. Dutton also testified that Mr. Haley told her, at the funeral parlor where her deceased's husband was laid out, that "Mr. Dutton has left you a beautiful love letter. Now Burnell won't have to worry about his education. Dutton has seen to it that he will go to college like he always wanted to do."

About three weeks after the death of the insured defendant delivered to plaintiff's mother a "Claim Settlement Certificate," (Plaintiff's Exhibit No. 4). This document recites that defendant is holding $16,006.38 (the $6.38 being interest) in settlement under the policy, which sum shall be held, with accumulated and accrued interest and any dividends, intact by the company, not subject to withdrawal during the lifetime of plaintiff unless plaintiff lives to attain his majority, in which event it is payable to him (a) $1000 in one sum, and (b) the remainder with interest at three and one-half per cent per annum in monthly installments of $5 per $1000, so payable until exhausted; that if plaintiff dies while any portion of the insurance remains unpaid, then "such amount shall be payable in one sum to his executors or administrators."

Mr. Haley testified that at the time he delivered the policy to the insured at his place of work in the Beaumont Exchange of the American Telephone and Telegraph Company, he read the policy to the insured, went over its provisions with the insured, as was his practice or custom, taking about thirty minutes for that purpose; that the insured asked no questions whatever, having relied on Mr. Haley to handle the insurance; that he asked the insured if the name and amount were correct, explained the double indemnity provision for accidental death, and read to the insured the attached rider Form 10777, and Options 3 and 4 of the policy referred to in that form; that the insured did not read the policy but was right with him (Mr. Haley) when he explained it; that he discussed the terms of Form 10777 with the insured, who said it was "O. K."; that the insured made no objection to it, and that he left the policy with the insured.

Mr. Haley further testified that he would go weekly to the telephone company premises for the purpose of representing the defendant company on the employees' salary savings plan of insurance in effect there with the telephone company, and that he saw Mr. Dutton there, but that Mr. Dutton never discussed the policy with him and never complained that it was not in accordance with his views, ideas or desires; that within a day to two weeks after he had gone over the provisions of the policy with Mr. Dutton, he wrote the letter (Plaintiff's Exhibit 3), while the matter was rather fresh in his recollection; that he thought it was more likely that he would correctly remember what he explained to Mr. Dutton within two weeks after he had explained it than he would ten years thereafter (at the trial

herein), and that in all likelihood the explanation of the insurance contract made in the letter was as accurate as he could make it; that he thought the policy was fresh in his mind at the time he wrote the letter.

The only agent of defendant that had anything to do with the taking of the application for the insurance was Mr. Haley. No other agent furnished any of the data used as a basis for the policy and no one else had any hand in the relationship with Mr. Dutton on the matter of the issuance of the policy. Mr. Haley testified that he had a distinct recollection of having read the policy to Mr. Dutton when he delivered it to him. He also testified that he had various discussions concerning the issuance of the policy, and the matter of the dispute herein, with Mr. Millar or Mr. McCammon, attorneys for plaintiff, prior to his testifying at the trial. He stated that he did not ever make any mention of the fact in any of those discussions with said attorneys that he had discussed the terms and the provisions of the policy with Mr. Dutton at the time he delivered the policy.

On cross-examination Mr. Haley testified that said attorneys did not ask him "specifically" whether he had explained the terms and conditions of the policy to Mr. Dutton at the time of delivery of the policy; that they did not question him regarding the facts and circumstances as to the issuance of the policy and what he knew about this case, and what facts he could furnish to throw light upon the whole situation; and that he didn't have any objections at any time to telling said attorneys that he explained the terms and conditions of the policy to Mr. Dutton, but that he did not mention to any of said attorneys at any time having discussed with Mr. Dutton the terms and provisions of the policy at the time it was delivered. Later on we shall refer to further testimony given by Mr. Haley.

The insured died intestate leaving an estate of $4,484.02 which was divided between the wife and the son, and plaintiff's share or total estate, according to his guardianship records in the probate court at the time of the trial, was $2,762.67, which brought him an annual gross income of $121.92.

There was evidence on behalf of defendant that, so far as the home office was concerned, the first time it had any notice of any complaint as to the mode of payment of plaintiff's share of the insurance was six years after the insured's death when it received a letter from the office of Mr. Millar (an attorney for plaintiff). Mrs. Dutton testified that she protested to Mr. Haley about the policy being incorrect the very day Mr. Haley delivered her check from defendant, shortly after her husband's death. Referring to Mr. Haley and the policy, she stated: "We started trying to have it revised immediately"; that she did not hear from Mr. Haley and tried to contact him but couldn't reach him, so she finally turned the matter over to her attorneys.

Defendant offered, without objection, mathematical computations as to the distribution which would be payable to plaintiff in installments under the facts as they actually exist in the case (with respect to the double indemnity due, the age of plaintiff at the time of the insured's death, the interest earned on retained amounts, etc.) and on the basis of payment according to plaintiff's theory on reformation of the policy. The statement indicates that the proceeds would be entirely paid out when plaintiff attained forty years of age.

Defendant also offered, subject to plaintiff's objection on the ground that it was irrelevant and ignored the actual facts of the accidental death and the double indemnity payment, other computations as to the effect of making $50 per month payments to plaintiff, commencing at insured's death, if the insured had not died from accidental means (which he did), and assuming the single indemnity provision applied (which it admittedly did not), and predicated on the assumption that the insured died when the plaintiff would be three years old.

Plaintiff contends that the evidence adduced by him was clear and convincing and justified the reformation of the insurance contract; that the trial court erred in finding that he was not entitled to have the contract reformed and in dismissing his petition. There can be no doubt that equity will reform a contract which, by reason of mutual mistake, does not express the real agreement between the parties. The cases cited by plaintiff on this point do unquestionably state the principle for which plaintiff herein contends. However, we do not believe that the evidence adduced by plaintiff brings this case within that principle because the evidence clearly does not measure up to the high and strict requirements that are necessary to entitle plaintiff to a decree of reformation of the contract.

It has been held by our courts in many cases that to justify the reformation of such an instrument as we have before us, on the ground of mutual mistake, the evidence of such mutual mistake, must be "so clear, convincing and complete as to exclude all reasonable doubt in the chancellor's mind," and that "a mere preponderance of the evidence is not sufficient." Furthermore, courts of equity do not grant reformation on "probability" or even the mere preponderance of the evidence, but only on "certainty of error." [Employers' Indemnity Corporation v. Garrett et al., 327 Mo. 874, 38 S. W. (2d) 1049; Stubblefield v. Husband, 341 Mo. 38, 106 S. W. (2d) 419.]

The general rule is stated as follows:

"The high remedy of reformation is never granted on a probability, or on a mere preponderance of evidence. The strict requirements relate not only to the mistake and the mutuality thereof or to the fraud alleged, but also to the real agreement which is alleged to have been made." [45 Am. Jur., Reformation of Instruments, sec. 116, p. 651.]

It has been held by the courts of this State that in order to show a mutual mistake in a written instrument the preceding agreement must be shown by "clear and convincing proof." [Crouch v. Thompson, 254 Mo. 477, 162 S. W. 149; Wilhite et al. v. Wilhite, 284 Mo. 387, 224 S. W. 448.]

The testimony of Mr. Haley, who was called by plaintiff as a witness, instead of showing a mutual mistake by the parties, refutes the idea that there was such a mistake made in the drafting of the policy in the form in which it was delivered to the insured. Unfortunately for plaintiff's theory of a mutual mistake, plaintiff, in order to show what took place at the time the terms of the contract were discussed by the insured, had to call Mr. Haley as a witness—he being the only person who could tell what was said and done by the insured and himself at that time. In this connection, Mr. Haley's testimony was:

"Q. In your discussion with Mr. Dutton prior to the issuance of this policy, what did he seem to impress upon you that he wanted to do primarily? A. He wanted to provide protection for that boy.

"Q. And did he say when he wanted the protection, before he was twenty-one years old or after he became twenty-one? A. Well, he wanted it to provide some kind of money for him to either go in business or do anything he wanted to after he became twenty-one. He didn't want him to squander the money.

"Q. Well, was there any discussion between you and Mr. Dutton to the effect that he would be here and he would take care of the boy up to when he was twenty-one if anything should happen? A. Well, he thought he had enough property on the outside to take care of the boy up to the time he got twenty-one.

"Q. And he was interested in taking care of the boy after he became twenty-one years of age, as I understand it? A. That is right.

"Q. And who suggested this provision that when the boy became twenty-one that he was to secure a thousand dollars when he was twenty-one in the event the policy matured at that time or had matured by that time? A. He did.

"Q. Did he have any specific reason why he wanted the boy to have the thousand dollars if it matured at the time he reached twenty-one years? A. Well, he thought that if he would give him a little bit at twenty-one, then a little later in life he would have enough sense, enough ability to keep the rest of it if he gave him that.

"Q. Those are matters that were discussed between you and Mr. Dutton at the time? A. At the time of the application, yes, sir."

In addition to the foregoing testimony showing expressly that the insured had definite and positive ideas and views of his own as to when and in what amounts he wanted his son to receive the insurance benefits provided for, there is the further testimony of Mr. Haley that after the policy had been sent on from the home office

he personally took it out to the insured and went over with the insured the provisions relating to the payment of. the proceeds, and that the insured said the policy was ''O. K.''

The testimony of Mr. Haley that he saw the insured almost every week after the delivery of the policy and that the insured never at any time expressed any dissatisfaction with the policy, and did not make any claim of mistake in the policy, is strong proof that the insured did not believe there was any mutual mistake in the policy as written. Furthermore, the fact that the insured accepted the policy and kept it for more than one year prior to his death without objection to any of its terms or conditions gives rise to a presumption that the contract as written sets forth fully and correctly the true agreement of the parties. [45 Am. Jur. ''Reformation of Instruments,'' sec. 112, page 649; Evers v. Brotherhood of Railroad Trainmen (Mo. App.), 172 S. W. (2d) 899; Kohnke v. Kohnke (Mo.), 250 S. W. 53.]

There is no evidence in the record to overcome such presumption. On the contrary, the weight of the evidence supports the view that there was no mutual mistake in the policy as written. We appreciate the strength of the argument that from a practical standpoint the insured could be expected to have made provision for his infant son to have the benefit of the insurance during the many years of his minority prior to the age of twenty-one, when he needs it, but what evidence there is on that point shows that the insured did not view the matter in that light. It must be remembered that we are dealing with a policy that represents the insured's views, and not the views of anyone else. Perhaps if the insured had been possessed of supernatural powers and could have divined that he was to die an accidental death in so short a time after arranging for the insurance, he might have made different arrangements for payment of his son's benefits. Then again, he might have made the same arrangements shown in the policy as written. In any event, we have no right to indulge in guess work to reach a decision. Nor is it within our province to substitute any views that we or others might have, in place of the views of the insured, as to the wisdom of withholding plaintiff's benefits until he attains the age of twenty-one years. We must base our decision upon the evidence, and the evidence affirmatively shows that, for reasons he gave Mr. Haley, the insured definitely did not want his son to receive any of the benefits of the insurance until he was twenty-one years old.

Plaintiff strongly relies on what Mr. Haley wrote in his letter (Plaintiff's Exhibit No. 3), shortly after the policy was written, to show that there was a mistake in the policy as written, and argues that Mr. Haley's representations in writing are not subject to the vicissitudes of human memory through the years, and that Mr. Haley's letter to the insured, being, as plaintiff calls it, a ''contemporaneous document,'' should be accorded greater weight than parol testimony

in weighing the evidence. He cites authorities to support these contentions.

There is nothing in the record to show that the insured answered the letter or agreed with the views therein expressed, or said anything about it. Mr. Haley was not requested by the insured to write a letter giving his views on the policy, nor was he authorized to do so by the defendant company. The letter, therefore, merely represents the unilateral impressions concerning the policy that Mr. Haley did not have before him at the time, because it had been delivered to and accepted by the insured. There is nothing in the letter to indicate that there was a mutual understanding, between the insured on one side and Mr. Haley as the representative of defendant on the other, that the policy was to contain a plan of payment different from that in the policy as written.

Plaintiff argues that the letter shows that he was to receive $50 a month beginning from the date of the death of the insured. Although it might be construed to show Mr. Haley's individual understanding in that respect, it wholly fails to show that there was an understanding to the same effect on the part of the insured.

In paragraph seven of plaintiff's amended petition it is alleged that: "pursuant to said policy, defendant has paid one-fifth of said sum, or four thousand dollars ($4,000), to said Julia T. Dutton." The total amount payable under the policy, omitting interest, is conceded to be $20,000—one-fifth of which, or $4,000, is payable to Julia T. Dutton. This leaves $16,000 as the amount of insurance benefits to which plaintiff is entitled. However, in the letter Mr. Haley stated that Mrs. Dutton was to receive only $1,000. Even if we disregard the additional death benefit of $10,000 based on accidental death and treat the policy as one for only $10,000, Mr. Haley's letter was incorrect in stating that Mrs. Dutton was to receive only $1,000, because that is not one-fifth of the amount due her on the policy but is only one-tenth thereof.

The letter, therefore, shows that there was a mistake, but it was a mistake made by Mr. Haley in referring to Mrs. Dutton's share of the insurance. Neither said mistake nor anything else in the letter purports or tends to show a *mutual* mistake made by the parties with respect to the policy as written and delivered.

We think that Mr. Haley's letter is entirely too indefinite and uncertain to serve as a basis for reformation of the contract. It fails to measure up to the high, strict, clear and convincing quality of proof required for the reformation of a contract.

In Robinson v. Korns, 250 Mo. 663, 674, 675, 157 S. W. 790, our Supreme Colurt, referring to cases involving the reformation of contracts, said:

"The rule that must be applied in these cases is that the mistake to be corrected must have been made in drawing the instrument and

not in making the contract out of which it grew. [Parker v. Van-hoozer, 142 Mo. 621, 629.] *This mistake must be mutual, and not unilateral.* That is to say, both must agree to what the instrument shall contain, and both must act in executing it upon the belief that it is so written. This rule is illustrated in Dougherty v. Dougherty, 204 Mo. 228, 238, in which the scrivener acted for the grantees. This court said: 'His mistake was the mistake of the grantees, but not the mistake of the grantor, for whom he in no way acted, under the proof in this case. *The mistake is purely unilateral and one which courts of equity do not reform.* [Grand Lodge A. O. U. W. v. Sater, 44 Mo. App. l. c. 453; Meredith v. Holmes, 105 Mo. App. l. c. 352; Brocking v. Straat, 17 Mo. App. l. c. 305; Benn v. Pritchett, 163 Mo. l. c. 572; Miller v. Railroad, 162 Mo. l. c. 440-441.]' '' (Emphasis ours.)

In the case at bar the letter merely represents Mr. Haley's unilateral understanding of the provisions of the policy and, in the absence of some evidence to show that the insured agreed therewith, the letter furnishes no basis for holding that there was a mutual mistake in the policy as written.

Plaintiff contends that the Claim Settlement Certificate is not in accordance with any agreement of the parties or the provisions of the policy. That, therefore, the funds held under said certificate are held solely by defendant's action, and that the proceeds of the policy must be deemed to be held as a trust fund for plaintiff's benefit, and as such may be expended as necessary for plaintiff's support under equitable decree on the facts pleaded.

In Court II of his amended petition plaintiff based his contention on the existence of a trust solely on the language, terms and conditions of the Claim Settlement Certificate. The contention is now made for the first time that there is a constructive trust, because, as contended by plaintiff, defendant is not holding the funds in question in accordance with the provisions of the policy as written, but is holding such funds under terms of its own devising and choosing, and that the terms of the Claim Settlement Certificate differ from those contained in Form 9175, the questionnaire (Plaintiff's Exhibit No. 2), and Form 10777, the rider attached to the policy, which rider is a part of Plaintiff's Exhibit No. 1.

Under the well known and long established rule plaintiff must be held in the appellate court to the same theory upon which he tried his case in the Circuit Court. This rule is well established and has been applied by our Supreme Court and Courts of Appeals in numerous cases. It has been stated in various ways by our courts. For instance, "A case will not be reviewed on a theory different from that on which it was tried below." Also, "Parties are restricted on appeal to the theory on which the cause was tried in the court below." And further, "An appellate court will review the case only on the

theory on which it was tried." This principle of law is so well settled that it would take. up entirely too much space to attempt to cite the cases in which it has been declared and applied. These many cases may be found in the Missouri Digest under "Appeal and Error," Key No. 171(1).

We believe it is our plain duty to apply the above mentioned rule to the theory of a constructive trust raised by plaintiff in this court for the first time. Hence, we hold that inasmuch as the case was not tried below on such theory, it cannot be considered by this court on appeal. We therefore proceed to determine the question that was properly raised by the second count of plaintiff's petition, namely, whether or not the language and terms of the Claim Settlement Certificate created a trust and made defendant a trustee in the holding of the proceeds of the policy in question. Although plaintiff now asserts in this court that there is a variance between the terms of the Claim Settlement Certificate and the terms of the policy with respect to the time and amounts of payments of benefits to him, it will be noted that he did not seek and is not seeking a reformation of said Claim Settlement Certificate. Whether any such remedy was or was not available to him, we are, of course, not called upon to determine.

We are of the opinion that no trust exists in this case. We believe that the relationship existing between the parties herein is that of debtor and creditor. A clear summarized statement of the distinctions between a trust relationship and that of debtor and creditor will be found in 36 Yale Law Journal 394, 1. c. 396. It is as follows:

"(1) A trustee occupies a fiduciary relation, and his obligation is ordinarily enforceable only in equity while a debtor is not a fiduciary, and his obligation is ordinarily enforceable in a court of law. (2) Loss without fault by a trustee is excused. (Here authorities are cited.) A debtor may be responsible irrespective of fault. (3) In case of bankruptcy, the cestui can take from the assets of the bankrupt trustee the specific trust property if he can identify it. In case of debt, the creditor must share *pro rata*. (4) The Statute of Limitations, if applicable, does not begin to run against a trustee until he has repudiated the trust obligation. Against a creditor's claim it begins to run from the maturity of the debt. (5) A trustee will be guilty of embezzlement if he converts trust funds to his own use. A debtor has no funds which can be the subject of conversion. [See Bogert, Trusts (1921) c. 2.]"

The obligation of defendant herein is greater than that of a trustee. As a trustee defendant would be only required to prudently invest the funds and pay over such income as might be earned. Should the principal be lost through circumstances not under defendant's control, it would, as a trustee, be excused from further obligation. Under the evidence in this record, defendant's obligation is definitely

fixed by the contract and it is liable thereon regardless of what it does with the money, and regardless of whether or not it earns anything thereon. The relationship is that of debtor and creditor, and defendant will be held to its fixed obligation as to all payments provided for.

In an action similar to the case at bar, brought in the Supreme Court of New York County, the application of the petitioner therein sought an allowance for maintenance out of the proceeds of an insurance policy. The contract provided that the proceeds of the policy were to be left with the insurance company and the company was to pay three and one-half per cent per annum, together with dividends, until the infant named therein should reach the age of thirty years, except that at certain ages she could withdraw a certain part thereof. The company issued a Claim Settlement Certificate after the insured's death showing the settlement of the claim. The petitioner contended that a trust fund had been created and that the court should exercise its equitable powers and anticipate the payment of the funds because of the dire need of the infant. The insurance company contended to the contrary—that there was no trust and that the relationship was one of debtor and creditor which could not be interfered with by the court, and that the contract of insurance could not be changed. The court sustained the insurance company's contention and denied the application. [See "In the Matter of the Application of Helen Goldstein," New York Law Journal, June 4, 1935, Carew, Judge, Special Term, Part 1. See also, McLaughlin v. Equitable Life Society of the United States (N. J.), 164 Atl. 578; Pierowich v. Metropolitan Life Ins. Co., 282 Mich. 118, 275 N W. 789; Richards "Law of Insurance" (4 Ed.), sec. 385.]

We hold that the trial court's action in the case at bar on both counts of plaintiff's petition was correct, and the judgment as to both counts is affirmed. *Hughes, P. J.*, and *Anderson, J.*, concur.