Joe **GALEMORE** and Sammy Babb,
Plaintiffs-Appellants,

v.

John **HALEY** and State Farm Mutual Automobile Insurance Company, a corporation, Defendants-Respondents.

No. 9034.

Springfield Court of Appeals,
Missouri.

Sept. 17, 1971.

Manuel Drumm, Sikeston, for plaintiffs-appellants.

Jackson, Thomasson, Dickerson & Gilbert, Donald L. Dickerson, Cape Girardeau, for defendant-respondent, State Farm Mutual Automobile Ins. Co.

STONE, Judge.

On *September 1, 1965*, a 1963 Ford automobile owned by Joe Galemore and "then occupied" by Sammy Babb was involved in a vehicular collision with a 1964 Pontiac Tempest sport coupe owned by John Haley and Virginia Haley, husband and wife, and then being driven by John. (All emphasis herein is ours.) Ensuing litigation resulted in entry of two judgments against John Haley in the Circuit Court of Mississippi County, Missouri, on October 13, 1967, to wit, one judgment for $1,239.54 in favor of Joe Galemore and another for $5,000 in favor of Sammy Babb. On May 21, 1968, Galemore and Babb as plaintiffs instituted the case at bar against John Haley and State Farm Mutual Automobile Insurance Company (State Farm) as defendants "on the theory that John Haley had a valid liability insurance policy with State Farm in force on the date of the . . . collision [*September 1, 1965*]" and that, since plaintiffs' judgments against defendant Haley had not been satisfied, they were entitled to proceed in equity against Haley and State Farm "to reach and apply the insurance money to the satisfaction of the judg-

ment[s]." Section 379.200.[1] At the conclusion of an extended trial, the court took the case under advisement and in due time filed written findings of fact and conclusions of law, as counsel had requested before submission [Rule 73.01(b); § 510.310 (2)], concluded that "plaintiffs have failed to prove that defendant State Farm . . . had a policy of insurance covering John Haley or his 1964 Pontiac on *September 1, 1965*," and accordingly entered judgment to that effect. Plaintiffs appeal.

The only State Farm policy on the Haley Pontiac (issued under circumstances hereinafter detailed) was Policy No. 1286 077–B27–25 (*the policy*) which by its terms afforded $10M/$20M/$10M liability, $1,000 medical payments, comprehensive, and $50 deductible collision coverages to "Haley, Virginia & John," the named insureds, for *a six-month "policy period" from February 27 to August 27, 1965.* Plaintiffs' theory of the case is that "both State Farm and the Haleys agreed to a different [six-month] policy period [i. e., *from March 9 to September 9, 1965*] than that expressed in the policy"; that "there should be a reformation of the policy contract" in that respect; and that, as so reformed, the policy afforded coverage for the accident of *September 1, 1965,* and "insurance money" [§ 379.200] for satisfaction of plaintiffs' judgments against John Haley.

■■ We observe preliminarily that, although reformation of the policy was an indispensable prerequisite to plaintiffs reaching and applying "insurance money" to be provided by that policy, their theory of the case was neither articulated nor suggested in their petition, and reformation of the policy was neither mentioned in the body of the petition nor sought in the prayer thereof. Of course, where a claim is one cognizable only after another claim has been prosecuted to a successful conclusion, the two claims may be joined in a single action [Rule 55.08; § 509.070], but

that does not license a plaintiff to wholly ignore the prerequisite claim in his pleadings. The claim for reformation of the policy should have been pleaded in the first count of plaintiffs' petition followed by the two counts seeking "insurance money" which would become available only upon reformation of the policy. See Binswanger v. Employers' Liability Assur. Corp., 224 Mo.App. 1025, 1027, 28 S.W.2d 448, 449; Steinberg v. Phoenix Ins. Co. of Hartford, Conn., 49 Mo.App. 255, 257 (cited in instant *plaintiffs'* brief). However, since all parties proceeded to and through trial without objection as if the issues had been raised and pleaded properly, we likewise treat them in all respects as though they had been. Rule 55.54; § 509.500; Anderson v. Dyer, Mo.App., 456 S.W.2d 808, 810(1); Greene v. Morse, Mo.App., 375 S.W.2d 411, 418(11), and cases there cited in note 16.

During the period this dispute was in incubation, John Haley, then 45 years of age who was a long-distance truck driver for various employers, and Virginia Haley, his wife, then 39 years of age who worked in a shoe factory at Charleston, resided in the village of Anniston which, as we know judicially, had a population of 307 at the time of the 1960 United States Census [Varble v. Whitecotton, 354 Mo. (banc) 570, 575, 190 S.W.2d 244, 246(4); State ex rel. Kopper Kettle Restaurants, Inc. v. City of St. Robert, Mo.App., 424 S.W.2d 73, 79(11)] and was located approximately eight miles south of Charleston, the county seat of Mississippi County, and six miles northeast of East Prairie, also in that county. Klotsch v. P. F. Collier & Son Corp., 349 Mo. (banc) 40, 46, 159 S.W.2d 589, 592(1); Hood v. M.F.A. Mutual Ins. Co., Mo.App., 379 S.W.2d 806, 810(4).

The Haleys, then driving a 1957 Oldsmobile, shopped for another automobile during February 1965. After "going in and out" of Pope Motors, the Pontiac-Oldsmobile agency in East Prairie, and dickering with William C. Pope, the owner thereof,

---

1. All statutory references are to RSMo 1969, V.A.M.S., and all references to rules are to the Supreme Court Rules of Civil Procedure, V.A.M.R.

for "about a week," the Haleys during the afternoon of *February 27, 1965,* purchased the 1964 Pontiac Tempest sport coupe subsequently involved in the collision of *September 1, 1965.* Upon trial, testimony as to the purchase of that automobile and the procurement of insurance coverage thereon was given by three witnesses, namely, (1) Mrs. Virginia Haley, (2) William C. Pope, for 23 years "the owner of Pope Motors," and (3) Mrs. Frances DeField, the widow of Bruce DeField who was the State Farm agent at Charleston in 1965 but had died prior to trial. John Haley, who (so his wife said) "purchased the car" and "got the car financed," did not appear as a witness.

The 1964 Pontiac was purchased and "financed through GMAC" in this manner, i. e., the Haleys traded in their 1957 Oldsmobile, paid $250 in cash, and executed a "Retail Instalment Contract (Chattel Mortgage)" securing payment of the "Time Balance" of $2,001.90, which Pope Motors sold and assigned to GMAC. *Witness Pope* testified that "when we sell a car . . . one of the very first things that we try to determine is where the insurance is going to be furnished, either with the finance company or outside insurance company." If by an "outside" company, "quite frequently we contact the agent . . . right then before the contract is completed"— *"the car has to be insured before it leaves the premises."* Furthermore, Pope confirmed the fact that, with respect to any automobile financed through GMAC, it was "a requirement" of his "working arrangement with GMAC" that insurance coverage with any "outside" company "had to be verified by [him] before the car could leave the lot." So, in the transaction under consideration, "I [Pope] asked Mr. and Mrs. Haley who they had their insurance with, and they informed me that it had been dropped on the car that they were trading in [the 1957 Oldsmobile] because it [the car] was paid out . . . but they wanted insurance from the same company they had [it] with before, State Farm

Mutual," and that they "previously had [this] insurance with" Bruce DeField, the State Farm agent at Charleston. Accordingly, Pope telephoned DeField "in their [Haleys'] presence."

■ In concluding his testimonial account of the conversation between DeField and himself, Pope said "they [the Haleys] had made arrangements to insure this particular car [the 1964 Pontiac] at that particular date [February 27, 1965]." Pope's entire account of this conversation, including the quoted statement, was stricken on objection of plaintiffs' counsel "because of the dead man's statute." That statute, Section 491.010, is a *qualifying* enactment in that it removes the common-law disqualification of witnesses by reason of interest and is a *disqualifying* enactment only in the instances and circumstances therein stated. Fellows v. Farmer, Mo.App., 379 S.W.2d 842, 849(10). See Wilcox v. Swenson, Mo., 324 S.W.2d 664, 667(1); Freeman v. Berberich, 332 Mo. 831, 842–845, 60 S.W.2d 393, 398–400. In an action such as that at bar, involving disqualification vel non under the first or "transactions" proviso of § 491.010 [Fellows v. Farmer, supra, 379 S.W.2d at 849], "to be rendered incompetent, the witness must be both interested and be a party to the contract or cause of action. . . ." Ham & Ham Lead & Zinc Inv. Co. v. Catherine Lead Co., 251 Mo. 721, 741, 158 S.W. 369, 375(4); City of Puxico v. Harbin, Mo., 252 S.W. 393, 394(3). See Bernblum v. Travelers Ins. Co. of Hartford, Conn., 340 Mo. (banc) 1217, 1225–1227, 105 S.W.2d 941, 944–945 (8); McCutchan v. Kansas City Life Ins. Co., Mo.App., 122 S.W.2d 59, 70(11, 12). Pope was not "rendered incompetent" by § 491.010, and his testimonial account of his conversation with DeField was not inadmissible for the sole reason assigned by plaintiffs' counsel (i. e., "because of the dead man's statute") and should not have been stricken. However, that testimony was not considered by the trial court, and we need not and do not in any wise rest our appellate determination upon it.

*Mrs. Frances DeField* was a part-time office assistant, "mainly in the afternoons," for her husband, Bruce DeField, the State Farm agent at Charleston. She "answered the telephone . . . took payments . . . [and] did all kinds of clerical work" but was never an agent for State Farm. On February 27, 1965, she took a telephone call from Pope Motors but immediately referred it to her husband. While talking on this call, he was writing at his desk. Mrs. DeField was "sure" he then obtained the detailed information reflected by the handwritten entries in the State Farm application form (*the application*) for insurance coverage on the Haleys' 1964 Pontiac. Specifically, she was "sure he put in the effective date" of "*2/27/65*" shown in the application.

The six-month premium for the policy coverages shown in the application was $62.29. Mrs. DeField said that, in her husband's telephone conversation on February 27, 1965, "he told Pope Motors we would have to have money on it right away." However, during the period from February 27 to March 9, 1965, the only contact between the Haleys and the DeField Insurance Agency was initiated by Bruce DeField leaving his telephone number at Mrs. Haley's place of employment with a request that she "call him back," which she did.[2]

On March 9, 1965, Mrs. Haley went to DeField's office. Agent DeField was not there, but his wife was. Mrs. DeField testified that Mrs. Haley then paid $20 on the $62.29 six-month policy premium and signed the *application* theretofore "filled out" by Mr. DeField, affixing her signature, "Virginia Haley," on the line provided

for that purpose immediately under the entry showing an "*effective date*" of "*2/27/65.*" In turn, Mrs. DeField gave Mrs. Haley a narrow unsigned 3½″ x 8½″ slip of paper, referred to as a "*binder*" or "*binder receipt,*" which was detached from the original application. Handwritten entries in the appropriate spaces provided on this binder receipt showed that it had been issued to "Virginia Haley" for $10M/$20M/$10M liability, medical payments, comprehensive, and $50 deductible collision coverages on a "Pont 64" and that the "Amount Paid" was $20.00." When presented to Mrs. DeField on cross-examination as plaintiffs' exhibit 6, the binder receipt also showed "Date of Application *3/9 1965*" and "Effective Date *3/9 1965*" (The italicized figures in the last two quotations were handwritten, the remainder thereof was printed.) After carefully scrutinizing the binder receipt, Mrs. DeField declared that the (italicized) handwritten figures "don't look like my writing," pointing out certain particulars in which they differed from her genuine handwritten figures in other entries in binder receipt. Furthermore, her recollection was that she had not written the effective date in the binder receipt; and additionally she commented that such effective date (March 9, 1965) "is wrong, and I would have known it was wrong and I can't imagine myself putting it in like that." All of the handwritten portions of the binder receipt (including the italicized figures) had been entered in ink and obviously had been imperfectly, imprecisely and ineptly traced and overlaid in pencil (of which more betimes). The bottom line on the binder receipt provided for signature "By Agent" was still blank at the time of trial.

---

2. The trial court properly refused to permit Mrs. Haley to give her version of what was said in that telephone conversation, since she was a party to the policy contract in suit and Bruce DeField, the contracting agent for State Farm, the corporate defendant, was deceased. § 491.010; Williams v. Edwards, 94 Mo. 447, 451–452, 7 S.W. 429, 431(1) ; State ex rel. State Highway Com'n v. Jacobs, Mo.App., 281 S.W.2d 597, 599(1) ; Kern v. Prudential Insurance Co. of America, 8 Cir. (Mo), 293 F.2d 251, 259(11), certiorari denied 368 U.S. 969, 82 S.Ct. 443, 7 L.Ed.2d 397. See Bernblum v. Travelers Ins. Co. of Hartford, Conn., 340 Mo. (banc) 1217, 1226, 105 S.W.2d 941, 945.

*Mrs. Virginia Haley* testified that her husband, John Haley, had arranged for the financing of the 1964 Pontiac before she "went down after work and signed . . . the papers." She knew that the automobile "was to be financed through GMAC" and, from previous automobile financing deals, she understood that, "as part of that transaction" with GMAC and as "one of the conditions of being able to get a loan," she and her husband "were required to take insurance on the car." In short, "we knew we had to have insurance." Nevertheless, Mrs. Haley insisted that "my husband told [Pope] he would get his own insurance; he didn't say what insurance" and that, without Pope even having been informed "what insurance" the Haleys intended to obtain, "we [the Haleys] took the [1964 Pontiac]; we didn't give [Pope] no authority to call the insurance company, we told him we would get our own insurance, we was undecided at the time." It was not until Mr. Haley returned from his next over-the-road trip (so Mrs. Haley asserted) that "we decided we would go ahead and get State Farm" and on *March 9, 1965,* she went to DeField's office "to take out the insurance policy on the Pontiac." Her version of what then occurred was that she signed the *application,* described by her as a "blank piece of paper" with "no writing" on it, paid $20 to Mrs. DeField, and was given the unsigned *binder receipt* then in the same condition (so she said) in which it subsequently was received in evidence without "any alterations or changes."

However, since (as we have noted) all of the handwritten portions of the *binder receipt* entered in ink had been clumsily traced and overlaid in pencil, plaintiffs' counsel called two witnesses on this subject, namely, the Haleys' attorney and a secretary in his office, who offered this (otherwise unelaborated) explanation of "the purpose of that" (quoting the attorney): "We tried to make some copies of this document and the ink that was on here would not copy of (sic) the copy machine that we had, and in order to pick up a copy, one of the girls went over it with a pencil and outlined the writing so that there would be lead there that would show up on the copy machine."

In due time, State Farm issued its Policy No. 1286 077–B27–25 affording the desired coverages to the Haleys for the "Policy Period" of "02–27–65 to 08–27–65" as shown in the "Declarations" prominently displayed on the outside of the policy. Mrs. Haley received the policy "through the mail." She knew that it "was issued for a period of six months," but "I didn't look at the dates. . . . I put it in the car and that is where it stayed." Witness Richard Golden, State Farm's "service superintendent," testified that thirty days prior to the due date of the next semi-annual premium (in this instance, August 27, 1965) the "first premium notice is mailed"; and he identified copies of (a) the "expiration notice" showing "policy due date" of August 27, 1965, mailed to the Haleys three days after that due date, and (b) the "lapse notice" showing the same policy due date mailed to them twenty-three days thereafter. Mrs. Haley asseverated that "we just got the policy" and that she had never received or seen any premium notice, expiration notice or lapse notice.

■ Insurance is a matter of contract and is governed by the principles applicable to contracts [Eicks v. Fidelity & Casualty Co. of New York, 300 Mo. 279, 291, 253 S.W. 1029, 1033(3); Hall v. Missouri Ins. Co., Mo.App., 208 S.W.2d 830, 832(1)]; any claim or suit by a party to an insurance contract must be based upon the policy as issued [Bartleman v. Humphrey, Mo., 441 S.W.2d 335, 342(1); Hartford Accident & Indemnity Co. v. Farmington Auction, Inc., Mo.App., 356 S.W.2d 512, 518–519(5)]; and in this action under § 379.200 plaintiffs, as judgment creditors of a named insured in the State Farm policy, stand in the shoes of that insured and their rights are no greater and no less than such insured's rights would have been if

he had paid the judgments and then sued State Farm to recover the sums so paid. Greer v. Zurich Insurance Co., Mo., 441 S.W.2d 15, 30(19); Meyers v. Smith, Mo., 375 S.W.2d 9, 15(5); Drennen v. Wren, Mo.App., 416 S.W.2d 229, 233(6). Hence as plaintiffs' brief approximately and necessarily recognizes, reformation of the policy, which by its terms clearly provided coverage for a term expiring on August 27, 1965, was an indispensable prerequisite to their recovery herein.

▪ Equity will reform a contract only if the mistake is mutual, i. e., if the contract has been written "in terms which violate the understanding of both parties"[3] or, otherwise stated, if it appears "'that both have done what neither intended.'"[4] Furthermore, "[a] mutual mistake in a written instrument presupposes a prior or preceding agreement between the parties. To show the mutual mistake in a written instrument, the preceding agreement must ex necessitate be shown."[5] Likewise indicating acknowledgment of these governing principles, plaintiffs boldly assert in their brief "the evidence in this case clearly reveals that both State Farm and the Haleys agreed to a different policy period than that expressed in the policy."

The only bit of evidence even tending to suggest that State Farm "agreed to a different policy period than that expressed in the policy [February 27 to August 27, 1965]" was the unsigned binder receipt delivered by Mrs. DeField, herself not a

State Farm agent, to Mrs. Haley on March 9, 1965, which (as presented upon trial) showed "*3/9 1965*" as the "Date of Application" and "Effective Date." Particularly relevant and significant in this connection is the following finding of fact by the capable, conscientious and perspicacious trial chancellor: "The *application* in Bruce DeField's handwriting showed an effective date of February 27, 1965, when signed by Virginia Haley; the [*binder*] *receipt* clearly showed that it had been altered, the effective date had been changed, and was not in Mrs. DeField's handwriting and as such lacked probative force. Mrs. DeField was not an agent of the State Farm . . . and did not have authority to issue a binding receipt and her action in giving an unsigned receipt on March 9, 1965, does not show an intention of the parties to initiate insurance coverage as of that date." Also pertinent and noteworthy are (a) the chancellor's further finding of fact "that it was the intention of the parties . . . that said policy period begin on February 27, 1965, and end on August 27, 1965" and (b) his conclusion of law that "[a]ll negotiations and discussions between the parties concerning said policy of insurance were merged in the written policy" when issued and accepted.[6]

▪ "'The high remedy of reformation is never granted on a probability, or on a mere preponderance of evidence'" [Dutton v. Prudential Ins. Co. of America, 238 Mo.App. 1058, 1068, 193 S.W.2d 938, 943

3. Wilhite v. Wilhite, 284 Mo. 387, 393–394, 224 S.W. 448, 449(2); Baumhoff v. Lochhaas, Mo., 253 S.W. 762, 764(1); Croy v. Zalma Reorganized School Dist. R–V of Bollinger County, Mo., 434 S.W. 2d 517, 521(4); Allen v. Smith, Mo.App., 375 S.W.2d 874, 879(6).

4. Allan v. Allan, Mo., 364 S.W.2d 578, 581; State ex rel. State Highway Com'n. v. Schwabe, Mo., 335 S.W.2d 15, 19; Walters v. Tucker, Mo., 308 S.W.2d 673, 675; Herhalser v. Herhalser, Mo.App., 401 S.W.2d 187, 192(4).

5. Dougherty v. Dougherty, 204 Mo. 228, 237, 102 S.W. 1099, 1101(3); Crouch v.

Thompson, 254 Mo. 477, 488, 162 S.W. 149, 152; Feeler v. Gholson, Mo., 71 S.W. 2d 727, 729(4); Herhalser v. Herhalser, supra note 4, 401 S.W.2d at 192(6, 7). See Allan v. Allan, supra note 4, 364 S.W. 2d at 581(2); Zahner v. Klump, Mo., 292 S.W.2d 585, 587(2).

6. For supporting authority, see Bramble v. Kansas City Life Ins. Co., 349 Mo. 318, 327, 160 S.W.2d 746, 752(8); Hartford Accident & Indemnity Co. v. Farmington Auction, Inc., Mo.App., 356 S.W.2d 512, 519(6); Hall v. Missouri Ins. Co., Mo. App., 208 S.W.2d 830, 832(3); Wright v. Great Eastern Cas. Co., Mo.App., 206 S.W. 428, 429(2).

(5); 45 Am.Jur. Reformation of Instruments § 116, p. 651], but judicial reformation of a written instrument is permitted only upon clear, cogent and convincing evidence, which leaves no room for reasonable doubt.[7] And these "'strict requirements relate not only to the mistake and the mutuality thereof . . . but also to the real agreement which is alleged to have been made.'" Dutton v. Prudential Ins. Co. of America, supra, 238 Mo. App. at 1068, 193 S.W.2d at 943(5); Herhalser v. Herhalser, Mo.App., 401 S.W.2d 187, 193; 45 Am.Jur. Reformation of Instruments § 116, p. 651.

■ Additionally, on the record here presented neither the Haleys nor plaintiffs, whose rights are no greater, are in position to invoke the equitable relief of reformation. The issued policy, plainly affording the stated coverages for a six-month policy period from February 27 to August 27, 1965, was countersigned by agent Bruce DeField on *April 6, 1965*, mailed to the Haleys, and admittedly received by Mrs. Haley who "didn't look at the dates" but "put it in the car and that is where it stayed." Insofar as the transcript shows, no complaint about the stated policy period was voiced or indicated prior to plaintiffs' institution of the instant action on *May 21, 1968*. In these circumstances the Haleys are deemed to have accepted the policy as issued and neither they nor plaintiffs should now be heard to impugn its integrity.[8] Furthermore, one of the "Policy Conditions" of the policy so accepted by the Haleys was: "10. *Declarations.* By ac-

ceptance of this policy the named insured [Haley, Virginia & John] agrees that the statements in the declarations [which included "Policy Period (Month-Day-Year) 02–27–65 to 08–27–65"] are his agreements and representations, that this policy is issued in reliance upon the truth of such representations and that this policy embodies all agreements existing between himself and the company or any of its agents relating to this insurance."

■ Although we "review the case upon both the law and the evidence as in suits of an equitable nature" [Rule 73.01(d); § 510.310(4)] and, on such review de novo, reach our own conclusions as to the weight of the evidence [Hampton v. Niehaus, Mo., 329 S.W.2d 794, 800(6); Trotter v. Trotter, Mo., 316 S.W.2d 482, 484 (2); Masterson v. Plummer, Mo.App., 343 S.W.2d 352, 354(1)], in the discharge of our appellate function we must respect the pointed admonition that due regard should be given to the superior opportunity of the trial chancellor to judge of "the credibility and characteristics of the witnesses who testified before him" [Peine v. Sater, Mo., 289 S.W.2d 101, 102(1); Spaeth v. Larkin, Mo., 325 S.W.2d 767, 771(3); State ex rel. State Highway Com'n. v. Carlton Motor and Salvage, Mo. App., 453 S.W.2d 642, 647—see Rule 73.01 (d); § 510.310(4)], must honor the explicit mandate that "[t]he judgment shall not be set aside unless clearly erroneous" [Rule 73.01(d); § 510.310(4)—see Schroeder v. Prince Charles, Inc., Mo., 427 S.W. 2d 414, 420(7); Rothenhoefer v. City of

---

7. Helmkamp v. American Family Mutual Ins. Co., Mo.App., 407 S.W.2d 559, 566 (10); Binswanger v. Employers' Liability Assur. Corp., 224 Mo.App. 1025, 1035, 28 S.W.2d 448, 453(2); 43 Am.Jur.2d Insurance § 376, p. 424. See Stubblefield v. Husband, 341 Mo. 38, 47, 106 S.W.2d 419, 423(3); Edwards v. Zahner, Mo., 395 S.W.2d 185, 190(4); Thornburgh v. Warson Village Corp., Mo.App., 331 S.W. 2d 144, 148(3).

8. *Hartford Accident & Indemnity Co. v. Farmington Auction, Inc.,* supra note 6,

356 S.W.2d at 519(7); Neuner v. Gove, Mo.App., 133 S.W.2d 689, 694(7, 8); Steinberg v. Phoenix Ins. Co. of Hartford, Conn., 49 Mo.App. 255, 265(3). See American Insurance Co. v. Neiberger, 74 Mo. 167, 173(3); Kap-Pel Fabrics, Inc. v. R. B. Jones & Sons, Inc., Mo.App., 402 S.W.2d 49, 57(7); Farmers Mutual Hail Ins. Co. v. Kier, Mo.App., 296 S.W.2d 918, 920; Magers v. Kansas City Life Ins. Co., 239 Mo.App. 457, 191 S.W.2d 320, 328– 329; Evers v. Brotherhood of Railroad Trainmen, Mo.App., 172 S.W.2d 899, 903 (1).

St. Louis, Mo., 410 S.W.2d 73, 75(2); In re Estate of O'Neal, Mo., 409 S.W.2d 85, 90(1)], and may not reject a finding of fact by the trial chancellor unless we can point to some good reason for doing so [Burger v. Wood, Mo.App., 446 S.W.2d 436, 442(5); Bodine v. Wood Tech Corp., Mo.App., 423 S.W.2d 193, 195(2); Loague v. Loague, Mo.App., 407 S.W.2d 92, 101(5)] or are compelled by the record to conclude that such finding is clearly erroneous. Ramacciotti v. Joe Simpkins, Inc., Mo., 427 S.W.2d 425, 433(11); In re Franz' Estate, Mo., 372 S.W.2d 885, 900 (7). Mindful also that the inconsistencies and conflicts in the oral testimony were for the trial chancellor [Ethridge v. Perryman, Mo., 363 S.W.2d 696, 701(5); Allen v. Smith, Mo.App., 375 S.W.2d 874, 880 (7)], and that as trier of the facts the chancellor, in the discharge of his duty to weigh the evidence, might have believed or disbelieved any testimony affirmatively or defensively adduced by any party, even though such testimony was uncontradicted and unimpeached [Adam Hat Stores, Inc. v. Kansas City, Mo. (banc), 316 S.W.2d 594, 598(3); Beckemeier v. Baessler, Mo., 270 S.W.2d 782, 787(5); Bourne v. Manley, Mo.App., 435 S.W.2d 420, 428(8)], we accept and affirm without hesitancy or doubt the trial chancellor's findings of fact and the judgment entered thereon.

▰ None of the cases cited in plaintiffs' brief are factually analogous or legally controlling here. In each of the life and accident insurance cases[9] upon which counsel relied in oral argument, there were ambiguous, inconsistent or conflicting provisions in the policy contract itself, which invoked application of the principle that, in such instance, the court will adopt that interpretation most favorable to the insured.[10] But that principle does not authorize a perversion of language or the exercise of inventive power to create an ambiguity where none exists [Central Surety & Ins. Corp. v. New Amsterdam Cas. Co., 359 Mo. (banc) 430, 435, 222 S.W.2d 76, 78(1); Dieckman v. Moran, Mo., 414 S.W.2d 320, 321(3); Carter v. General American Life Ins. Co., Mo.App., 452 S.W.2d 253, 257]; and where, as here, there is no ambiguity, the clear, explicit, unequivocal policy contractual provision must be accorded its plain meaning. State ex rel. Prudential Ins. Co. of America v. Shain, 344 Mo. (banc) 623, 627, 127 S.W. 2d 675, 676(2); State ex rel. Mutual Ben. Health & Acc. Ass'n v. Shain, 350 Mo. 422, 427, 166 S.W.2d 484, 487(1); Kisling v. MFA Mutual Ins. Co., Mo.App., 399 S.W.2d 245, 248(2); McKinney v. Truck Insurance Exchange, Mo.App., 324 S.W.2d 773, 777(4).

The judgment of the circuit court is in all respects affirmed.

TITUS, P. J., and HOGAN, J., concur.

9. Halsey v. American Central Life Ins. Co., 258 Mo. 659, 167 S.W. 951; Glosch v. Central Life Ins. Co. of Illinois, Mo. App., 176 S.W.2d 46, 48(2, 3); Johnson v. American Cent. Life Ins. Co. of Indianapolis, Ind., 212 Mo.App. 290, 305–306 (3), 249 S.W. 115, 120(3); Stout v. Missouri Fidelity & Casualty Co., Mo. App., 179 S.W. 993, 994(1).

10. That this was the basis of the holdings in those cases not only was made manifest at the local citations and in the headnotes supplied by us in note 9, supra, but also was recognized and pointed out in later cases, e. g., in Broadway Laundry Co. v. New York Life Ins. Co., 351 Mo. 278, 284, 172 S.W.2d 851, 852(1); National City Bank of St. Louis v. Missouri State Life Ins. Co., 332 Mo. 182, 188–189, 57 S.W.2d 1066. 1068; Stevens v. Farm Bureau Mut. Ins. Co. of Missouri, Mo. App., 253 S.W.2d 538, 541–542.