Ethel THORNBURGH, (Plaintiff) Appellant,

v.

WARSON VILLAGE CORPORATION, a corporation, and Thomas J. White, (Defendants) Respondents.

No. 30280.

St. Louis Court of Appeals.

Missouri.

Jan. 19, 1960.

Motion for Rehearing or to Transfer to Supreme Court Denied Feb. 17, 1960.

H. Jackson Daniel, Husch, Eppenberger, Donohue, Elson & Jones, St. Louis, for appellant.

Kappel & Neill, Robert E. Staed, St. Louis, for respondents.

RUDDY, Judge.

This is an action for reformation of a lease. The trial court's judgment and decree was for defendants and plaintiff appeals.

Plaintiff alleges in her petition that defendant, Thomas J. White, deliberately and fraudulently omitted a provision in the lease giving plaintiff an option to renew the lease for five more years after its termination, although said defendant had agreed to said option. Plaintiff further alleges that if the aforesaid provision was not deliberately and fraudulently omitted then said provision was omitted by said defendant through inadvertence and mistake and that said lease was executed by plaintiff by mistake and oversight in the belief that said provision for an option to renew was contained in said lease.

Plaintiff contends that the evidence clearly established an agreement between the parties giving plaintiff an option to renew, as well as mistake on the part of plaintiff and inequitable conduct by defendants in omitting the renewal provision from the lease and, therefore, the trial court erred in denying reformation of the lease. A determination of this contention requires an examination of the evidence

Plaintiff was the sole proprietor of the Warson Village Children's Shop. Prior to coming to St. Louis County to open and operate the children's shop she was a resident of Milwaukee, Wisconsin, where she had been employed by Gimbel's Department Store as a buyer for a period of three years. In the course of this employment she signed no leases for her employer. She had thirty years business experience. Prior to moving to Milwaukee, Wisconsin, she was employed by Klines, a women's clothing store at 608 Washington Avenue in St. Louis, Missouri. While so employed she was chosen to open and operate a department of that store.

Sometime prior to 1952 plaintiff considered opening a children's shop in St. Louis, Missouri. About February or March of 1952 she started tangible plans to bring to fruition her consideration. At that time she contacted defendant, Thomas J. White, about possible store space in the Brentwood Shopping Center. White informed her there was no space available in that shopping center, but told her he was building a new addition on

the Warson Village Shopping Center. This shopping center was owned by Hannah White, mother of defendant Thomas J. White, and he was acting as her agent in the dealings with plaintiff.

Plaintiff, accompanied by Mr. Keil, went out to the Warson Village Shopping Center where they met White. Plaintiff testified Mr. Keil was a friend of her family and had introduced her to defendant, White. According to plaintiff's testimony, Keil was present during the conversation she had with White.

Plaintiff told White she would like to have Unit No. 2 of the shopping center, because it was closer to the "dress operations" of the center. White told plaintiff all units were available at that time. Plaintiff then told White she wanted a five-year lease with an option to renew the lease at termination for another five years. When plaintiff was asked what Mr. White said to this proposal, she answered: "Well, he said that he would draw the lease up and I asked him if it could be taken care of before I went back to Milwaukee. And he said, no, he would mail it to me in Milwaukee." Plaintiff asked White how much the rental would be and he told her "it would not exceed one hundred or one hundred fifty dollars per month." She told White the rental was satisfactory.

We think it opportune to relate at this point some remarks of the trial court made at the conclusion of plaintiff's case and when discussing defendants' motion for a directed verdict with the attorneys for the parties. The court told the attorney for plaintiff that he had the court reporter read the answer given by plaintiff when she was asked what Mr. White said in answer to her proposal for a five-year lease with an option to renew for an additional five years. The court pointed out that plaintiff did not testify that there was an agreement on the part of White to draw up a lease in accordance with plaintiff's terms. The court then told

plaintiff's attorney "there is nothing that would cause me to reform this lease." The court took defendants' motion for a directed verdict under advisement and instructed defendants to proceed with their evidence. At the close of defendants' evidence plaintiff again took the witness stand and under questioning by her attorney and the judge of the trial court, she testified that before she left the shopping center Mr. White said he would give her a five-year lease with an option to renew for an additional five years.

Returning to the evidence in plaintiff's case-in-chief it shows that plaintiff returned to Milwaukee after her visit to the Warson Village Shopping Center and the conversation with Mr. White. The lease did not arrive as promised and plaintiff telephoned White on two occasions. On both occasions White told her his father was very sick. On the occasion of the last telephone call she told White she wanted to give her employer two weeks notice of her resignation from her position and wanted to buy fall merchandise for the store. She testified White told her, "You can come on down, you haven't a thing to worry about. My word is my bond. My father is very sick and I cannot take care of a lease at this time. I'll get it made up when you get here." She came to St. Louis about April 1, 1952. At no time did she have any correspondence with White about the option to renew for five years.

Some time after plaintiff arrived in St. Louis, White called and told her the lease was ready for signing. She went to his office, the date of the visit she could not remember, and the only persons present were White and plaintiff. White told her he wanted three months advance rent as a deposit and that the rental would be one hundred seventy-five dollars per month. She questioned the amount of rental and White told her, "Well, that's what it worked out and that's what it would have to be." She told him "all right" and gave him a check for the de-

posit. She was asked if she read the lease and answered "No." She testified that White told her "you don't need to read it." Plaintiff then signed the lease. At this point the court said to plaintiff, "And you signed a paper without even looking at it?" and she answered, "Yes, I did, sir." She testified that at no time did White threaten her or force her in any way to sign the lease. He gave her a copy of the lease after it was signed and she has had the lease in her possession ever since. The lease was dated April 18, 1952.

Plaintiff never looked at the lease before she opened the business, which was about September 1, 1952. About August 1953, plaintiff received a bill for heating costs. She then "glanced through" the lease to see if there was anything in it calling for payment for heat. She did not notice the absence of a provision about the option because she "wasn't looking for that." She sent the heating bill and her copy of the lease to her attorney. In a letter to the attorney she pointed out to him that there was no provision in the lease for a heating charge and recited other grievances concerning the premises she occupied, but said nothing about the failure of the lease to contain an option to renew.

In the year 1955 (three years after the lease was executed) plaintiff began to hear rumors in the shopping center that she was going to lose her lease. She then looked at the lease and for the first time learned it contained no option to renew. She talked to White and told him she was upset about the rumors she heard and thought the lease contained an option to renew for an additional five years. He told her she had nothing "to worry about." When she asked him to give her "something in writing," he refused.

In the summer of 1957, when her lease was about to expire, White wanted her to move into larger quarters in the shopping center. She declined the proposal.

After the lease expired eviction proceedings were instituted. Plaintiff stopped paying rent in June 1957 because she knew the lease would expire in August.

Excerpts from the deposition of Mr. Keil were read into evidence as a part of plaintiff's case. This witness testified that in the discussion with Mr. White as to the terms of the lease, plaintiff said "she wanted a five-year lease with a five-year option" and that White said "that he would take care of it and send her a satisfactory lease in a few days."

The only witness for the defendants was defendant Thomas J. White. His testimony showed he was president of the defendant corporation, which became the owner of the shopping center after the lease with plaintiff was executed. He was agent for his mother when the lease was negotiated and executed. White said the lease represented the agreement he had with plaintiff. The lease contained no option to renew said lease. He did not promise plaintiff an option to renew the lease for an additional five years. He said his father died January 21, 1952. He further said, when the lease was executed he did not intimidate or threaten plaintiff; that she signed the lease in his presence and he gave her a copy of said lease. White did not believe Mr. Keil was present at the time stated by plaintiff in her testimony. He said he met Keil after the lease was signed. In response to questions by the court, White again said, "I did not tell her (plaintiff) that I would give her a five-year option."

In the fourth year of the lease White made a statement to plaintiff indicating some dissatisfaction with her operation of the store. It was on that occasion plaintiff, for the first time, said "she thought she had an option." Subsequently, plaintiff asked for a renewal of the lease and was refused.

The power of the court to reform an instrument is an extraordinary

one and must be guarded with zealous care, and exercised with great caution. Reformation will be granted only in a clear case of fraud or mistake. 76 C.J.S. Reformation of Instruments § 3, pp. 328, 329.

■■ The rules applicable to our duty in reviewing this appeal were well stated in the case of Stubblefield v. Husband, 341 Mo. 38, 106 S.W.2d 419, loc. cit. 423, where the court said:

"If a deed is sought to be reformed on the grounds of mutual mistake, or canceled on the grounds of mistake or fraud, the evidence to justify either must go beyond a mere preponderance of the testimony and remove all reasonable doubt. * * * Or, to express it in another way, the proof to justify such action on the part of the court must be so clear, convincing, and complete as to exclude all reasonable doubt in the mind of the chancellor. (Citing cases.)

" 'Although this court hears an equity case de novo on the merits, it is the rule to defer to the findings of the chancellor, where they are not against the weight of the evidence, especially where the witnesses personally appeared before him and their credibility is involved. (Citing cases.)' Branner v. Klaber, 330 Mo. 306, 49 S.W.2d 169, loc. cit. 178."

In a later case, Mueller v. Mueller, Mo., 318 S.W.2d 365, loc. cit. 369, the Supreme Court in restating the rule of deference to the findings of the trial chancellor, said:

"The solution to this case turns primarily on the credibility of the witnesses and the evaluation of their testimony. The trial chancellor, in contrast to this court, in determining their credibility had the opportunity to hear them and observe their demeanor on the witness stand. In such a situation a reviewing court will give due regard to the better oppor-

tunity of the trial court to pass on the credibility of the witnesses who orally testified before him, and while it has the authority to make its own findings, it will not set aside a judgment under such circumstances unless it is clearly erroneous."

The rule stated in the Mueller case, supra, is merely a reiteration of the command contained in Section 510.310, subd. 4 RSMo 1949, V.A.M.S.

■ Applying the rules, as stated aforesaid, we think the evidence sufficiently supports the denial by the trial chancellor of reformation of the lease.

Plaintiff's evidence failed to furnish the clear, cogent and convincing proof required in order to permit the trial court to reform the lease because of mutual mistake of the parties or because of inequitable conduct on the part of defendant, White. In his testimony White clearly and emphatically denied that he had a agreement with plaintiff for an option to renew the lease for an additional five years. Plaintiff's testimony in regard to what was said by White, as to the option, is not as clear and emphatic as that of White. The first time she was asked what White said about her proposal for an option to renew the lease, she answered, "Well, he said that he would draw the lease up * * *." This answer was not evidence of a clear, cogent and convincing promise on the part of White to give plaintiff an option to renew. It was not until after the court questioned the sufficiency of her evidence to show an agreement on the part of White to draw up a lease in accordance with plaintiff's terms, did plaintiff again take the witness stand. In her second effort she said White told her he would give her a five-year lease with an option to renew for an additional five years. The questioning of plaintiff by the court and the court's verdict show the trial court attached no credence to plaintiff's testimony in this respect.

Another significant bit of testimony that casts doubt on the credibility of plaintiff's testimony was her statement about the long distance telephone conversations she had with White when she called him from Milwaukee. She said that on both occasions he told her his father was very sick and he gave this as a reason for not forwarding the promised lease. It will be remembered that plaintiff testified she made her first contact with White about store space in February or March 1952. White testified his father died January 21, 1952, which was several months prior to the first contact made by plaintiff with White. Thus, there was conflict in the testimony in this respect which the trial court by its verdict resolved in favor of defendant, White.

In addition to the above, certainly the trial court took into consideration the thirty years of business experience had by the plaintiff in responsible positions and was unable to reconcile this experience with her testimony that she failed to read the lease at the time it was executed and failed to note the absence of the option to renew when she glanced over the lease upon receiving the heating bill. It is almost inconceivable that plaintiff, with a background of thirty years in responsible positions in business establishments, would fail to read a lease that called for payment of rental totaling $10,-500 over a period of five years. It is the duty of the trial chancellor to scrutinize the evidence carefully and consider its equitable and inequitable features. To reform the lease in the manner sought by plaintiff would be to ignore the right of the defendants to have it enforced according to its terms and to reward plaintiff for obvious gross negligence, if in fact she did fail to read the lease when she signed it.

Plaintiff seeks to find support and help from the testimony of Mr. Keil, which she states clearly and convincingly establishes the fact that an agreement was reached between plaintiff and White for an option for an additional five years. The most that can be taken from his testimony is that White would take care of preparing the lease and would send it to plaintiff. At least, his testimony does not show a clear promise to include in the lease an option to renew.

Concisely stated, this case presents only one issue of fact:—did White agree to give plaintiff an option to renew the lease for an additional five years? Plaintiff said he did. White said he did not. A determination as to which witness is to be believed controls the findings and judgment in the case. This is a case where the admonition of the statute (Sec. 510.310 subd. 4, supra) that we give due regard to the opportunity of the trial court to judge of the credibility of the witnesses should be followed. As we said in the Mueller case, supra, and, as has been said in numerous other cases, the trial chancellor has the opportunity to observe the witnesses and their demeanor on the witness stand, an opportunity which we do not have. Because of this opportunity of the trial chancellor we defer to his findings.

We have examined the cases cited by plaintiff in support of her contention and find that in all of the cases there was abundant proof of fraud or inequitable conduct to authorize reformation of the instruments under review. In all of the cases the appellate courts held there was clear, cogent and convincing testimony to support the need for reformation of the instruments. It is sufficient to state that the facts in the cases cited by plaintiff differ materially from those in the instant case.

The trial court's finding, judgment and decree for the defendants should be affirmed. It is so ordered.

WOLFE, P. J., and ANDERSON, J., concur.