James H. BRYAN et al. (Plaintiffs), Respondents,

v.

MEDICAL WEST BUILDING CORPORA-TION, a corporation (Defendant), Appellant.

John G. LEAHY and Joseph M. Krebs (Plaintiffs), Respondents,

v.

MEDICAL WEST BUILDING CORPORA-TION, a corporation (Defendant), Appellant.

No. 30330.

St. Louis Court of Appeals.

Missouri.

April 18, 1961.

Motion for Rehearing or to Transfer to Supreme Court Denied May 8, 1961.

Ackerman, Schiller & Lake, Clayton, for appellant.

H. Jackson Daniel, Selden Blumenfeld, John M. Goodwin, St. Louis, for respondents.

WOLFE, Judge.

This is an appeal by the defendant Medical West Building Corporation from a decree entered in two actions which were consolidated and tried as one in the Circuit Court. Both actions were brought by tenants of a building known as the Medical West Building, which was owned and operated by the corporate defendant. The actions related to the tenant lessees' right to free parking for themselves, their employees, patients or customers on the parking area adjoining the building.

The petitions in both cases, one by amendment at the close of the trial, prayed for a modification of the various leases under which the tenants held occupancy of their respective offices or stores, so that the leases would state that the recited rental entitled each of them to free parking for himself, his employees, his customers, clients or patients. O. S. Rudman, who had acquired controlling stock in the defendant corporation, was permitted to join as an intervenor. The court decreed that all of the leases except one be reformed, and the only appeal is by the corporate defendant.

The building and its parking facilities which are herein discussed were erected by the defendant corporation. The corporation was organized in July of 1954, and the incorporators were Richard J. Zoernig, Charles R. Judge, and Maryann Sheppard. Mr. Zoernig was elected President and General Manager of the corporation, and Mr. Charles Judge was its Secretary and Treasurer. Mr. Charles Judge also acted as attorney for the corporation at this time.

Upon its incorporation the defendant had acquired no property for the medical building it proposed to erect, but there was under consideration three sites. One of these did not appear to be acceptable to the doctors whom the incorporators hoped to interest as tenants, another became unavailable, so the corporation entered into an option agreement for a ninety-nine year lease on the site of the present building at 950 Francis Place in Clayton, Missouri. This was done in the fall of 1954, and later resulted in an outright purchase of the land.

As early as November, 1954 the corporation started leasing space to doctors in the building they planned to erect. There was an attempt to make the organization a cooperative affair, but this was not pursued. Some of the doctors did buy stock. In September, 1955 there was a meeting of the stockholders and lessees at the Gatesworth Hotel, and a number of the doctors present expressed their views about charging for parking. They were opposed to any charge for parking, and a summary of this meeting mailed to those who had been present stated that the doctors "vetoed the idea of charging patients for the use of the parking lot." This summary was prepared by Mr. Zoernig's secretary and approved by Mr. Judge.

Mr. Zoernig was manager of the building after its erection and continued as manager of the corporate affairs. He was in charge of the leasing and the negotiating of the leases under which the plaintiff tenants took occupancy. He wrote a letter to Dr. George A. Mahe, Jr., when negotiating a lease with him, and in the letter he stated, "We are furnishing air-conditioning, heating, janitor service, and of course, parking." Similar letters were sent to other plaintiffs, one of which stated, "Basic rental includes air-conditioning, heating, janitor service, and parking." Mr. Zoernig testified that in the course of his negotiations he told the plaintiffs that there would be no charge for parking. He at no time told them that there would be any charge

for parking of their assistants, patients or customers. Mr. Zoernig and Mr. Judge did discuss charging for reserved parking, and they sought to raise additional revenue by offering reserved parking space. The rate at which this was offered ranged from $10 to $12.50 a month, but generally the rental for the reserved space was paid separately and apart from the rent by those plaintiffs who desired reserved space. The leases signed by Mr. Zoernig as President of the Medical West Building Corporation, lessor, and the plaintiffs, as lessees, were all on a standard printed form of commercial lease, with two exceptions.

The plaintiffs and the dates of their leases are as follows: James H. Bryan, M.D., November 22, 1954; James W. Bynum, D.D.S., December 16, 1957; A. V. Doran Company, April 16, 1957; E. H. Fishgall, D.D.S., March 13, 1957; Samuel L. Gilberg, D.D.S., July 2, 1957; Marshall B. Greenman, M.D., April 15, 1955; James N. Haddock, M.D., September 26, 1955; Lee W. Hawkins, M.D., February 1, 1956; F. Joseph Hayden, D.D.S., August 30, 1957; John E. Holland, D.D.S., October 29, 1956; T. R. Hollinshead, D.D.S., October 19, 1956; T. R. Hollinshead, Jr., D.D.S., October 19, 1956; E. H. Hunter, Jr., D.D.S., March 26, 1957; David N. Kerr, M.D., October 10, 1956; Joseph M. Krebs, M.D., September 13, 1957; John G. Leahy, M.D., September 13, 1957; George Mahe, Jr., M.D., October 8, 1956; Kenneth D. Michael, M.D., September 26, 1955; James K. Monteith, February 5, 1957; Elmer Richman, M.D., April 23, 1957; Everett R. Roeder, Jr., D.D.S., December 3, 1955; O. W. Schaedlich, D.D.S., April 15, 1957; Alfred S. Schwartz, M. D., December 14, 1956; Roscoe W. Turner, D.D.S., March 29, 1957; John Waterston, D.D.S., November 19, 1956.

All of the plaintiffs testified at some length about their conversations with Zoernig prior to signing their respective leases. The testimony of each of them need not

be set out, for in most respects it was practically the same. There were five exceptions to this which we will deal with later, but the other plaintiffs in substance testified that during the course of their conversations Zoernig had told them that there would be adequate free parking for them, their help and patients or customers.

One stated that Mr. Zoernig said "that there would be adequate parking, and it was mentioned that this would be provided to myself, my father, and my nurse and my patients, free of charge." Another stated, "Mr. Zoernig reiterated that parking was free and that it would be available for the physicians and their office staff and their patients; if we wanted reserved space, there would be a charge for the reserved space." Another said that Mr. Zoernig told him "there would be adequate parking, and it was mentioned to me that this would be provided to myself and my nurse and my patients, free of charge." Another testified, "Mr. Zoernig stated that I and my patients would have unlimited parking if I became a tenant of the Medical West Building." Plaintiff Monteith leased space for his business of selling kitchen equipment. He was in business with his wife. He testified that he talked to Mr. Zoernig twice before leasing, and that on both occasions he was assured that there would be adequate free parking for himself, his wife and their customers. Mr. Zoernig told both plaintiff Monteith and plaintiff Doran that it was not necessary to put anything about free parking in their leases.

The testimony of the doctors who were plaintiffs was along the line of the doctors' testimony as set out above except for that of plaintiffs Kerr, Hunter, Hawkins, Fishgall, and Richman. Doctor Kerr did not present any evidence of an agreement about free parking, and the other four did not testify that there was an agreement that their employees would have free parking.

As stated, the leases under which the plaintiff took occupancy of their suites in the Medical West Building were with two exceptions on a standard printed form of commercial lease, with blank spaces to type in conditions not covered by the printed portion. The conditions and obligations typed in the leases varied to some extent, but in none of the plaintiffs' leases, including the two that were typewritten, is there any reference to free parking. The lease of Mr. Monteith provides, "Reserved parking space can be obtained at a rental of $10.00 a month", and the lease of Dr. Schaedlich provides, "One reserved parking space is reserved for lessee at a charge of $12.50 per month."

When the leases were sent to the plaintiffs for their signatures, most of them were signed and returned executed, but some of the plaintiffs submitted the leases to their attorneys before signing. In most of those cases nothing was said to the attorney about parking. Dr. Mahe stated that he discussed the lease with his lawyer, and that in listing the things he wanted in the lease he said, "The matter of free and adequate parking seemed so obvious that we just scratched it off." Dr. Holland, who also consulted his lawyer, Mr. Northcutt Coil, testified, "Mr. Coil suggested that we put parking in my lease, but I said, 'Mr. Coil, we have so much in there it would be picayunish to put all these things in there.'" Some leases did provide for free parking, and those tenants are of course not plaintiffs herein. One is a Dr. Kerstein, and his lease states, "One reserved parking space and the right of lessee's patients to use the building parking lot adjoining with patients of other tenants."

In the planning of the building the customs of other medical buildings of the area were studied, and all of those considered furnished free parking to their tenants and patients. The Medical West Building is a three-story medical office building, with 60,000 square feet of space. Immediately adjoining it is a parking area which consists of a street-level lot and an upper deck connected to the building. Occupancy by some of the plaintiffs started early in 1947, and all of the plaintiffs, their patients or cus-

tomers and assistants used the area free of charge until May 1, 1958.

From the inception of the projected Medical West Building those interested in it were troubled with the problem of financing the construction. A building company, Merle-Jung, Inc., agreed to attempt the financing and to construct the building. The fee that they were to receive was $65,-000. Part of this was paid by 938 shares of stock in the Medical West Building Corporation. In negotiating the building loan, Mr. Merle prepared an application for mortgage financing, which was offered as defendant's "Exhibit K".

In this application he listed, as part of the anticipated revenue from the building, a parking lot income of $22,400. He stated that he arrived at that figure by allowing 50 free parking spaces for the doctors and estimating that the remaining 120 spaces would be occupied three times daily at a 20-cent charge. Merle said that he arrived at the parking lot figure as the result of discussions he had with Mr. Zoernig. Merle was never an officer of the corporation, and the memorandum given him by Zoernig showed no income from the parking other than that derived from the rental of reserved spaces. Neither Zoernig nor Mr. Judge saw the loan application prepared by Merle at the time it was prepared.

In the fall of 1957, the majority stockholders, consisting of Zoernig, Judge, and Merle, were attempting to sell out. Merle presented to the other two a proposition whereby a prospective purchaser he had obtained agreed to buy the building and lease it back to the seller, but Mr. Judge considered the rental provided, beyond the capacity of the corporation to pay. There followed a discussion of charges for parking, and Mr. Judge stated that the doctors had been told that the parking would be free and that an attempt to charge them would cause all sorts of difficulties. Merle's comment to this was, "Well, you never know until you try." Merle prepared a sales prospectus showing a parking lot income of $22,464.

In September of 1957 a Mr. Oxenhandler talked to Merle about the possibility of selling to O. S. Rudman. Merle wanted to liquidate his stock interest. Zoernig, Judge, and some others agreed to sell theirs. Oxenhandler was to act as agent for the sellers, and he testified that the files and records of the corporation were turned over to him. He testified that he saw two statements, both of which had been prepared by Merle. One of these was the sales prospectus mentioned showing a prospective parking lot income of $22,464. He testified that Zoernig told him that he thought the figure was quite conservative. Zoernig testified that he had no knowledge of one of the statements of which Oxenhandler spoke, and that Oxenhandler never had the sales prospectus with him when he discussed the rental and parking.

The same two statements which were prepared by Merle were given to a Mr. Huggins, who was a certified public accountant. He was employed by Rudman to check the proposed sale, and he had been given a power-of-attorney by Rudman, the purchaser, to close the sale. Huggins attempted to see if the projected rental income in the statement and prospectus prepared by Merle conformed to the corporation records, and he found that it did not. Rudman and Oxenhandler both assured him that $22,000 could be realized on the parking, so he relied upon that figure. He was told by Mr. Judge that there would be trouble if they attempted to charge for the use of the parking lot.

The sale to Rudman was closed in February of 1958. Oxenhandler became vice-president of the corporation, and later resigned and became business manager. A form letter dictated by Oxenhandler was sent to all of the tenants informing them that, effective March 17, 1958, the free parking would be limited to one hour, that there would be a charge of $12.50 per month for reserved space on the lower

level, and $5 per month on the upper level. The letter also set out that there would be hourly charges for patients after the first hour, and unreserved parking at the rate of 85 cents a day.

On March 20, 1958, another letter was sent by Oxenhandler, in which he stated that there would be a delay in putting into effect the parking charges. On June 27, 1958, he sent another letter to the tenants, requesting them to sign an agreement for modification of their leases. The pertinent parts of the form of the "Lease Modification" were as follows:

"In consideration of the obligations mutually assumed, the undersigned Lessor and Lessee do herewith modify the lease heretofore entered into between the parties as follows:

"1. It is agreed between the parties that the Lessor's parking charges to Lessee, Lessee's employees, Lessee's patients and Lessee's customers during the balance of the term of this lease shall not exceed the following rates:

"Reserved parking spaces: $12.50 monthly per car on any area of the Lot for each Lessee (including executives of corporate Lessees) or doctors whose name appears on Lessor's Building Directory; $5.00 monthly per car for such doctor's or Lessee's employees on the upper landing.

"Unreserved parking spaces: 1st hour, 35¢ or free if ticket is stamped by undersigned Lessee; 2nd hour, 35¢; 3rd hour, 25¢ with maximum of 85¢ per day.

"2. During the remaining term of this lease Lessee shall not be required to pay any increase authorized by Lessor's Board of Directors for parking charges but in the event the Lessor's Board of Directors shall adopt a resolution to decrease or terminate the parking charges, such resolution shall inure to the benefit of the Lessee.

"3. It is agreed between the parties that Lessor shall have the right to modify and change the aforesaid schedule except as to the undersigned Lessee, Lessee's employees, Lessee's customers or Lessee's patients.

"4. All other terms and provisions of the aforesaid lease shall remain in force and effect without modification."

The plaintiffs did not sign the modification, but instead brought these two actions, one in June of 1958 and the other in July of the same year.

The court, after finding the Medical West Building Corporation the corporate owner of the building and each of the plaintiffs tenants, went on to state its findings as follows:

"4. Prior to the execution of each of the said written leases by and between each of said plaintiffs and defendant, Medical West Building Corporation, defendant represented to, and agreed and covenanted with each of plaintiffs (except those plaintiffs hereinafter specifically referred to), in consideration of the rents to be paid by said plaintiffs, that each of said plaintiffs (except those plaintiffs hereinafter specifically referred to) would be entitled to the unrestricted use of the parking area hereinabove described for themselves, their patients, customers, sub-tenants and employees during the term of each of the respective leases of said plaintiffs without further or additional charge by said defendant to said plaintiffs or their patients, customers, sub-tenants and employees.

"5. Prior to the execution of each of the said written leases by and between each of the plaintiffs, Hunter, Hawkins, Fishgall and Richman, defendant represented to, and agreed and covenanted with each of said plaintiffs Hunter, Hawkins, Fishgall, and Richman, in consideration of the rents to be paid by said plaintiffs, that

each of said plaintiffs would be entitled to the unrestricted use of the parking area hereinabove described for themselves and their patients during the term of each of the respective leases of said plaintiffs without further or additional charge by said defendant to said plaintiffs or their patients.

"6. That Plaintiff Kerr did not meet the burden placed upon him of showing any agreement between said plaintiff and the defendant, Medical West Building Corporation, relating to parking on said defendant's property.

"7. Prior to the execution of the lease by and between plaintiff A. V. Doran and defendant, Medical West Building Corporation, and prior to the execution of the lease by and between plaintiff James K. Monteith and said defendant, defendant additionally represented to both of said plaintiffs A. V. Doran and James K. Monteith that it was unnecessary specifically to include said agreement with respect to the use of said parking area, as aforesaid, in their respective leases.

"8. Each of the plaintiffs, except plaintiffs Hunter, Kerr, Hawkins, Fishgall and Richman, executed his separate lease with the defendant, Medical West Building Corporation, in reliance upon the aforesaid representation by defendant as set out in Paragraph 4 above, and the agreement by and between said plaintiffs with said defendant concerning the use of the above-described parking area without additional charge or payment as set forth in Paragraph 4 above.

"9. That the plaintiffs Hunter, Hawkins, Fishgall, and Richman executed their said separate leases with the defendant, Medical West Building Corporation, in reliance upon the aforesaid representation by the defendant as set out in Paragraph 5 above, and the agreement by and between

each of said plaintiffs with said defendant concerning the use of the above-described parking area without additional charge of payment as set forth in Paragraph 5 above.

"10. No specific written reference to such agreements is contained in any of the aforesaid leases concerning the use of said parking area by plaintiffs or their employees, sub-tenants, patients, or customers."

The decree from which the Medical West Building Corporation has appealed provided that all of the plaintiffs' leases except five should be modified as follows:

"Except as charges or payments may have been otherwise provided in this lease for the use by lessee of parking space specially reserved for the use of lessee, lessor and lessee agree that lessee, his patients, customers, sub-tenants and employees shall have the unrestricted use of the parking area, immediately adjacent on the north to the Medical West Building, without separate or additional charge or payment therefor."

As to the remaining five, four leases were modified as above except for the provision for free parking for employees. Plaintiff Dr. Kerr was denied relief.

■ The appellant contends that the court erred in decreeing reformation of the plaintiffs' leases because the evidence was not clear, cogent, and convincing. In discussing this point the appellant first points out the quantum of proof required in order to properly decree the reformation of a written instrument. Such proof must go beyond the mere preponderance of the evidence and must be clear and convincing. It must leave no reasonable doubt in the mind of the chancellor that the instrument sought to be reformed is insufficient to effectuate the intention of the parties to it. General Refractories Co. v. Howard, 328 Mo. 1139, 44 S.W.2d 65; Van Eaton v. Dennis, Mo.Sup., 242 S.W.2d 21;

Leimkuehler v. Shoemaker, Mo.Sup., 329 S.W.2d 726; Stubblefield v. Husband, 341 Mo. 38, 106 S.W.2d 419; Thornburgh v. Warson Village Corporation, Mo.App., 331 S.W.2d 144.

■ It appears evident that the proof meets this requirement. Without restating the evidence, it is obvious that the plaintiffs that prevailed each thought that he was to receive free parking for himself and those who came to him for professional and business purposes. Most of them were convinced that they were to have free parking for their help also. They had been told by Zoernig, the president of the corporation, that free parking was included in their basic rent. The appellant attempts to discredit the testimony given by the physicians on the ground that the leases were not uniform as to policy, and that some contained a variety of conditions not present in other leases. We are urged to give weight to the leases of those not plaintiffs herein. In so far as these shed any light upon the intention of the parties, the one most clearly to the point is the lease of Dr. Kirstein, which accorded him "one reserved parking space and the right of lessee's patients to use the building parking lot adjoining with the patients of other tenants."

■ The representations made by Merle and Oxenhandler in their effort to sell the stock of the corporation had no bearing upon agreements reached by the corporation with its tenants. The plaintiffs herein were not parties to the efforts to sell. The buyer's accountant was fully advised that the charge for parking which the buyer proposed had not been made or provided for. Oxenhandler's effort to get the tenants to sign the "Lease Modification" would have been wholly unnecessary if it had not been apparent to him that free parking had been accorded them at the time the leases were entered into.

■ We are not impressed by the fact that some of the plaintiffs submitted the leases to lawyers before signing them. The lawyers did not negotiate the agreements, and their failure to call attention to the lack of a provision for free parking is unimportant. McCormick v. Edwards, 351 Mo. 1017, 174 S.W.2d 826; State ex rel. State Highway Commission v. Schwabe, Mo.Sup., 335 S.W.2d 15.

The only other point raised also goes to the sufficiency of the evidence. It is asserted that the evidence was insufficient to prove a mutual mistake in the omission of a provision for free parking. As far back as 1851, in the case of Leitensdorfer v. Delphy, 15 Mo. 160, loc. cit. 166, the Missouri Supreme Court had before it the question of an omission from a deed which the plaintiff sought to reform by having the court supply the words omitted. On the question of the sufficiency of proof of mistake, the court said, "It is sufficient that the parties had agreed to accomplish a particular object by the instrument to be executed, and that the instrument as executed is insufficient to effectuate their intention."

Leitensdorfer v. Delphy was cited in the recent case of State ex rel. State Highway Commission v. Schwabe, Mo., 335 S.W.2d 15, and the above quotation was set out in italics. The Schwabe case, supra, affirmed a judgment reforming a deed under facts sufficiently similar to those before us to make the law that it stated applicable to all points herein raised.

That case was a condemnation proceeding to acquire additional land for Highway 40. The State Highway Commission had acquired its original right of way by deed from Louis and Mary Noble. The agent who secured the deed had assured the sellers that they would have access to the highway by a county road which intersected the land deeded. No reservation of access to the highway was contained in the deed, and after some use of the county road as access to the highway, the Highway Commission blocked off the access and sought by condemnation to obtain more land. The

Nobles counterclaimed in the condemnation suit, seeking reformation of the deed by which they had originally conveyed so that it would provide access for the land remaining.

As in the facts before us, there had been an agreement to grant a right that both parties intended that one of them should enjoy, yet the instrument executed failed to reserve the right agreed upon. There, as in the instant case, the parol evidence was held sufficient to show the true intention of the parties, and the court inserted by reformation the reservation that had been omitted.

In the present case the omission of rights to the parking area supplied by the court's decree was fully warranted under the law and the evidence. State ex rel. State Highway Commission v. Schwabe, supra; Net Realty & Investment Co. v. Dubinsky, Mo.App., 94 S.W.2d 1108; McVey v. Phillips, Mo.Sup., 259 S.W. 1065; McIntyre v. Casey, Mo.Sup., 182 S.W. 966.

The judgment of the Circuit Court is affirmed.

ANDERSON, P. J., and RUDDY, J., concur.