**DEHNER URBAN REDEVELOPMENT
CORPORATION—ST. LOUIS,**
Plaintiff-Appellant,

v.

**DUN & BRADSTREET, INC.,**
Defendant-Respondent.

No. KCD 28744.

Missouri Court of Appeals,
Kansas City District.

June 12, 1978.

Thomas A. Sweeny (Popham, Popham, Conway, Sweeny & Fremont, P. C.), Kansas City, for plaintiff-appellant.

Sam L. Colville, Stephen D. Aliber, Kansas City, for defendant-respondent; Shook, Hardy & Bacon, Kansas City, of counsel.

Before PRITCHARD, P. J., SWOFFORD, C. J., and DIXON, J.

DIXON, Judge.

The trial court, sitting without a jury, found against the plaintiff on both counts of its petition for damages under and reformation of a lease agreement and found for the defendant on its counterclaim for monies mistakenly and inadvertently paid under the lease. Plaintiff appeals seeking a reversal of the trial court's judgment on Count II which requested reformation and seeking reversal of the judgment in favor of defendant on defendant's counterclaim.

The operation of the tax escalation clause contained in a lease agreement between plaintiff Dehner Urban Redevelopment Corporation–St. Louis (hereinafter "Dehner"), as lessor, and defendant Dun & Bradstreet, Inc. ("D & B"), as lessee, is the genesis of the dispute. The lease provided for a 20 year lease period with options to renew the lease. The tax escalator clause provides that:

> "the annual rental payable under this lease shall be increased by an amount equal to the amount by which the real estate taxes (including any special assessments) assessed and paid by the Lessor for any tax year during the term or any renewal term hereof is greater than the 'Lessor's Tax Payment.'"

The "Lessor's Tax Payment" is defined in the lease to mean:

> "The real estate taxes, including any special assessments, assessed and paid by the Lessor for the first tax year after the beginning of the term of this lease in which the property *with all improvements* is assessed for real estate tax purposes." (emphasis added).

Relevant here is a portion of the Urban Redevelopment Corporations Law:

> "The real property of urban redevelopment corporations acquired pursuant to this chapter shall not be subject to assessment or payment of general ad valorem taxes imposed by the cities affected by this law, or by the state or any political subdivision thereof, for a period of ten years after the date upon which such corporations become owners of such real property, except to such extent and in such amount as may be imposed upon such real property during said period measured solely by the amount of the assessed valuation of the land, *exclusive of improvements . . . ."* (emphasis added). § 353.110 RSMo 1969.

The City of St. Louis, Missouri, by ordinance, adopted the provisions of the statute.

Initial discussions concerning the erection of a building and the leasing of it to defendant began in 1960 or 1961 between Charles Dehner, President of Dehner, and Jay Smith, then Vice President of D & B. On January 4, 1962, a written proposal was submitted to D & B by Dehner. The letter confirmed a conversation between Mr. Smith and Mr. Dehner in which Dehner proposed to construct for D & B a building in the Mill Creek Renewal Area. This letter further stated:

> "We offer to build and lease this building to you for a twenty-year term at an annual rental of $27,500.00, payable monthly in advance, with the usual real estate escalator clause providing any increase in real estate taxes or special assessments after the first year following completion of the building will be assumed by you as additional rental.

.    .    .    .    .

Our rental figure is based on the taxes being paid on the present assessment of the land only, with the improvements not being subject to any real estate tax the first ten years. Thereafter, for the next fifteen years, the real estate taxes will be based on 50% of the normal assessment of the property. There should be no increase in taxes, therefore, for the first ten years of the leased term."

A week later Mr. Dehner wrote another letter to Mr. Smith reviewing the real estate taxes applicable to urban redevelopment in St. Louis and the tax escalator clause. Regarding the tax escalator clause, the letter states:

"Your lease tax escalator clause will be based on your first year of occupancy. Taxes will be at a minimum the first ten years. However, I want to be sure it is understood that taxes will increase drastically after ten years. It will be based on the true value and will be charged at fifty percent of that value. I would estimate based on today's tax rate of approximately $44.00 per thousand and with some increases that taxes will go up $5,000.00 to $7,500.00 per year on this property. The lease tax escalator clause will cover any increases after the first full year of occupancy."

Thereafter, J. McKeen, Treasurer of D & B, responded with a letter of intent. The letter, dated January 17, 1962, reads, in pertinent part, as follows:

"The purpose of this letter is to express the intent of Dun & Bradstreet, Inc. to lease from you the building you expect to construct at St. Louis, Missouri, as proposed in your letter dated January 4, 1962 . . .

It is expressly understood that this letter of intent will enable you to proceed to have final plans, specifications, and working drawings prepared. . . .

It is further understood that Dun & Bradstreet, Inc. shall have no obligation to you unless and until final plans and specifications are approved by Dun & Bradstreet, Inc. and a definitive lease between Dun & Bradstreet, Inc. and your

company for the premises described in your letter dated January 4, 1962 is approved and executed."

The location for the proposed building was not approved by Urban Renewal, so there was a change in location; and, by letter, the parties agreed to a change of location but with the same conditions.

Subsequently, a draft of the lease was prepared by Mr. McGannon, Dehner's attorney, who participated in the negotiations concerning the final agreement. Mr. McGannon testified that the language in the final lease meant the same thing to him as in his original draft, that is, that D & B would pay the increase in taxes after the first full tax year. The language Mr. McGannon used for the tax escalator clause in the original draft was that, "any increase in real estate taxes or special assessments applicable to the demised premises occurring after the first full tax year during the term of this lease shall be borne by the Lessee." This language came from the correspondence Dehner had with D & B which was furnished to Mr. McGannon and which was available to him when he prepared the draft. Mr. McGannon submitted the prepared draft to Mr. Dehner who sent a copy to D & B.

Mr. Bingham, Secretary of D & B, wrote a letter accompanied with a copy of the draft to the law firm of White & Case, who served as outside counsel. Pertinent to the tax escalator clause, the letter said, "Basically the deal is for a 20 year lease as sole occupant of a building to be constructed in the redevelopment area at an annual rental of $27,500, we to pay any increase in real estate taxes or special assessments after the first full tax year during the term of the lease, . . . . .

White & Case reviewed the letter and draft and in their reply letter to D & B suggested that consideration be given to:

"(a) Providing that the basic real estate tax liability shall be a sum equal to the real estate taxes payable by Lessor for the second fiscal tax year in which the building is assessed, for tax purposes, as a fully completed building (is more apt to

result in fair base figure for a tenant's purposes)."

While the same idea as that expressed in the above letter is carried out in the final agreement, that precise language is not used.

On August 3, 1962, Dehner executed the lease agreement, and D & B executed it on August 13, 1962. Between these two dates, Prudential Insurance Company prepared a lease analysis dated August 10, 1962. Prudential was to furnish the end loan money on the building so Dehner had to have a lease which would meet with Prudential's approval. A copy of the lease analysis was sent to Dehner. In the lease analysis, the provision concerning "rental" is as follows:

"As additional rent, Lessee shall pay annually an amount equal to the amount by which the real estate taxes (including any special assessments) assessed and paid by Lessor for any tax year during the term or any renewal term is greater than "Lessor's tax payment," which is defined as the real estate taxes, including any special assessments assessed and paid by Lessor for the first tax year after the beginning of the term of the lease in which the property with all improvements is assessed for real estate tax purposes."

This language is substantially identical with similar language in the final lease. Prudential approved the final lease agreement.

In addition to the lease agreement, a separate document was signed by Dehner and D & B. This document, dated February 19, 1963, states that the lease in question "constitutes the entire lease agreement between the parties . . . .

Mr. Dehner testified that it was his intention that the final lease accurately portray the agreement reached in the correspondence between Dehner and D & B and that he would not have signed a document if he thought it didn't portray the agreement as set out in these letters. If he obligated himself to pay an additional $5,000 or $7,500 in taxes, the deal would be a loss. Mr. Dehner further testified that he had a conversation in Jay Smith's office, and Smith said they were basing the taxes on the first full year of occupancy, 1963, and that Smith was concerned about Dehner's getting a very low assessment in '63 and Smith's getting struck with a high assessment in '64. Mr. Smith testified that he did not recall this conversation and that he didn't really see how it could be done because the statute set out the tax on the redevelopment land.

Mr. Smith and Mr. Bingham both testified that the final lease agreement conformed and accurately set out, as far as D & B was concerned, the intentions of both D & B and Dehner at the time it was executed.

Beginning in 1966 and continuing through 1975, inclusive, Dehner sent D & B bills, as additional rent, for the difference between the real estate taxes assessed and paid by Dehner in 1963 and those assessed and paid by Dehner in the subsequent years. D & B paid these bills up until and including 1972. However, in 1973, Dehner sent D & B a bill for $3,928.25, which was the difference between the real estate taxes assessed and paid by Dehner in 1963 and those assessed and paid by Dehner in 1973. D & B refused to pay this bill and the subsequent bills of 1974 and 1975. Dehner then brought this suit for tax payments as billed and, in Count II for reformation, D & B counterclaimed for the payments made under Dehner's previous billings for the taxes paid from 1963 to 1973.

Looking first to Dehner's claim that the trial court erred in denying reformation, Dehner contends that the judgment of the trial court was against the weight of the evidence in that the written documents established that the agreement of the parties was for 1963 to be the base tax year. Dehner further contends it is obvious that someone mistakenly inserted the language "with all improvements" into the final lease without realizing and with the principals not grasping at the time of execution of the lease that these words would change the base tax year to 1973 under § 353.110 RSMo 1969. In addition to the letters of negotiation, Dehner points to the conduct on the part of D & B in paying the excess tax for

the ten years following execution of the lease as further evidence that the parties intended 1963 to be the base tax year.

Principles relating to reformation are well recognized. "The power of the court to reform an instrument is an extraordinary one and must be guarded with zealous care, and exercised with great caution." *Thornburgh v. Warson Village Corporation*, 331 S.W.2d 144, 147–48 (Mo.App. 1960). Only in a clear case of fraud or mistake will reformation be granted. *Thornburgh, supra.* Such mistake must be mutual and common to both parties to the instrument, that is, it must appear that both parties have done what neither party intended. *Grossman Wrecking Co. v. Bituminous Casualty Corp.*, 518 S.W.2d 719 (Mo. App.1974). In addition, the claim of mutual mistake in a written instrument presupposes a preceding or prior agreement between the parties and, in order to show mutual mistake in a written instrument, it is necessary to show the prior agreement. *Herhalser v. Herhalser*, 401 S.W.2d 187 (Mo.App. 1966). A written instrument will be reformed only upon clear, cogent, and convincing evidence, which leaves no room for reasonable doubt. This degree of proof relates not only to the mistake and the mutuality thereof, but also to the actual agreement which is alleged to have been made. *Brewer v. Blanton*, 555 S.W.2d 381 (Mo. App.1977); *Galemore v. Haley*, 471 S.W.2d 518 (Mo.App.1971). The burden of proof is on plaintiff-appellant. *Grossman Wrecking Co., supra.*

Dehner's reliance on the conduct of defendant in paying the excess tax for the ten years following execution of the lease as evidence showing the true intent of the parties is misplaced. While the construction the parties themselves place upon an agreement is of considerable significance in ascertaining the meaning of terms in an ambiguous contract, a contract free from ambiguity is to be construed as written. It is only when the contract or contract term is unclear that the court considers evidence of how the contract was understood or acted upon by the parties. *Modine Manufac-*

*turing Company v. Carlock*, 510 S.W.2d 462 (Mo.1974); *Willman v. Beheler*, 499 S.W.2d 770 (Mo.1973); *Latimer Motors, Ltd. v. McIntosh Motors, Inc.*, 512 S.W.2d 875 (Mo. App.1974). The trial court found that the tax escalator clause of this lease agreement was not ambiguous or susceptible of more than one meaning, and plaintiff has not challenged that finding on appeal. Plaintiff has not cited, nor could it, any authority which states that the conduct of the parties is to be considered in showing the intent of the parties where the contract term is not ambiguous.

Persuasive on this issue is *McCrory Stores Corporation v. S. M. Braunstein, Inc.*, 102 N.J.L. 590, 134 A. 752 (1926). Dealing directly with erroneous overpayment of taxes under a lease, the New Jersey court held:

"It is further argued as a reason for reversing the judgment before us that, because the lessor presented to the lessee a bill for the excess taxes of the year 1920 over those assessed for the year 1919, and that this bill was paid by the lessee—all of which is admitted—such action was a construction put upon the lease by the parties to it. We think that there is nothing in this contention. The lease speaks for itself. Its construction is not in doubt. The payment presumably was made by reason of a lack of appreciation by the tenant of its obligation under the lease; but, whether this be so or not, the action of the parties just referred to cannot increase or decrease the obligation imposed by that instrument." *McCrory Stores Corporation, supra* at 754.

On the broad issue of the sufficiency of the evidence to support the trial court's finding against reformation, this court's review is governed by Rule 73.01 as construed in *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). An appellate court must sustain the decree or judgment of a trial court unless:

". . . there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. Appellate courts

should exercise the power to set aside a decree or judgment on the ground that it is 'against the weight of the evidence' with caution and with a firm belief that the decree or judgment is wrong." *Murphy, supra,* at 32.

 Applying the standard of proof in reformation cases set forth in *Galemore, supra,* and considering the burden upon Dehner, the evidence more than sufficiently supports the denial by the trial court of reformation of this lease; and this court does not have a "firm belief" that the trial court's judgment was wrong.

Dehner's second and final contention is that the trial court erroneously applied the law to the facts in holding that D & B's letters of intent "could only be interpreted as expressing the intention of defendant not to incur any obligation to plaintiff unless and until a definitive lease agreement between them had been approved and executed."

Dehner asserts that, *if* Dehner had completed the building as specified by D & B and D & B refused to sign a lease, D & B would be liable for breach of contract. In support of this argument, Dehner cites *Green v. Cole,* 103 Mo. 70, 15 S.W. 317 (1891). *Green* involved an agreement between plaintiffs who were real estate agents and defendant who was a landowner in which plaintiffs were given two years to sell lots of defendant's land. The parties agreed that the contract should be reduced to writing, which was done, but the defendant refused to sign. In reversing the trial court's judgment given on a demurrer to the plaintiff's evidence, the *Green* court did state that if the parties intended to be bound by the parol contract then effect will be given to that intention. But, more important to the present case is the statement in the *Green* opinion that:

> "Though the terms of the contract may all be agreed upon, still, if the parties make it a condition to the existence of a contract that the terms agreed upon be reduced to writing, and signed by them, there is no contract until this is done." *Green, supra,* at 318.

D & B's letters of intent expressly provided that it was under "no obligation" unless and until it approved the final plans *and a definitive lease was approved and executed.*

Dehner also cites *Riggins v. The Missouri River, Fort Scott & Gulf Railroad Company,* 73 Mo. 598 (1881). *Riggins* concerned the enforcement of an informal memorandum signed by both parties with the understanding that a formal agreement was to be later written out and executed. The formal agreement was not forthcoming. In upholding the trial court's instructions in *Riggins,* the distinguishing fact was that the parties had acted upon the memorandum; and, given that fact, the memorandum would be treated as a valid and binding contract. In the present case, there was a finalized, formal document executed; and, for that reason, *Riggins* has no application in this case.

Under the authority cited by Dehner, the trial court was not in error in holding that the D & B letters could only be interpreted as evidencing an intention not to incur any obligation to Dehner *until* a definitive lease had been approved and executed. The evidence being sufficient and no error of law appearing, the judgment of the trial court is affirmed.

All concur.